1

2

3

4

5

6

7

8

9

10

11



FILED ——— ENTERED
——— LODGED ——— RECEIVED

SEP 30 2004 MR

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND, | No. **CV04-2061** |
| Plaintiff, | COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 |
| vs. | |
| BERNARD J. EBBERS, SCOTT D. SULLIVAN, CITIGROUP, INC., SALOMON SMITH BARNEY INC., J.P. MORGAN CHASE & CO., J.P. MORGAN SECURITIES INC., BANK OF AMERICA CORP., BANC OF AMERICA SECURITIES LLC, ABN AMRO INCORPORATED, DEUTSCHE BANK AG, DEUTSCHE BANC ALEX. BROWN INC., LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS INC., CREDIT SUISSE GROUP, CREDIT SUISSE FIRST BOSTON CORP., GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS & CO., UBS WARBURG LLC, UTENDAHL CAPITAL PARTNERS, L.P., BLAYLOCK & PARTNERS, L.P. and ARTHUR ANDERSEN LLP, | 04-CV-02061-CMP |
| Defendants. | DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933    **ORIGINAL**

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1        This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value

2   to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

3        No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted

4   within this work.

5        Copyright © 2004 by William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP. William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this

6   writing/publication.

7        All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Lerach Coughlin Stoia

8   Geller Rudman & Robbins LLP is prohibited.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

**INTRODUCTION**

1.      This is a securities suit involving WorldCom, Inc. ("WorldCom" or the "Company"),[1] naming as defendants WorldCom's officers, its commercial/investment bankers and its accountants (collectively, "defendants") for violations of the Securities Act of 1933 ("Securities Act") arising out of plaintiff's purchases of WorldCom debt securities (the "WorldCom Bonds") first sold to public investors in WorldCom's 5/00 and 5/01 bond offerings (the "Offerings"). Plaintiff Western Conference of Teamsters Pension Trust Fund invested in WorldCom Bonds and has been damaged thereby.

2.      WorldCom and its bankers raised billions of dollars in offerings of investment-grade rated bonds in 00 and 01 by means of Prospectuses and Registration Statements filed with the U.S. Securities and Exchange Commission ("SEC") which contained false statements:

| Effective Date of Registration Statements | Face Amount of Notes Offered[2] |
| --- | --- |
| 05/12/00 | $5.0 billion |
| 05/09/01 | $11.8 billion |

3.      WorldCom then filed bankruptcy, the largest ever, and the bonds went into default. WorldCom has admitted in several phases, beginning in 6/02, that its financial results for prior years were overstated by as much as $11 billion. The Company's financial results included in the 5/00 and 5/01 Registration Statements and subsequent SEC filings, press releases and analyst reports were misstated by billions of dollars causing WorldCom bonds to trade at artificially inflated levels. In an era of enormous accounting scandals, this was the biggest.

---

[1]      WorldCom has since filed for bankruptcy and cannot, absent permission of the bankruptcy court, be sued. On 10/31/03, the Bankruptcy Court confirmed WorldCom's plan of reorganization and the Company emerged from bankruptcy in 4/04. Upon emergence, WorldCom changed its legal name to MCI, Inc.

[2]      The 5/00 offering included $1.5 billion in notes that matured in 01, prior to WorldCom's admissions of false financial statements, and are not part of this action.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 1 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

4.   The Registration Statements and Prospectuses, WorldCom's SEC filings, its press releases and analyst reports also contained other misleading statements about WorldCom's internal growth, its position in the industry and its ability to grow in the future.

5.   In fact, these statements were false. The Company's revenues were not growing due to the factors described, but due to improper and unsupported journal entries. Line costs were being manipulated such that the costs were materially understated. The Company was not on track to deliver solid performance, but was in the midst of declining revenues and increasing costs.

6.   Subsequent to each offering, defendants Ebbers, Sullivan, CitiGroup (and its star telecom analyst, Jack Grubman) and WorldCom's accountants made additional false statements. These additional false statements caused the prices of WorldCom securities (including those purchased by plaintiff) to be artificially inflated. Plaintiff made many of its purchases of WorldCom's 5/00 and 5/01 bonds after these additional false statements were disseminated.

7.   On 6/9/03, the Bankruptcy Examiner issued his second interim report. Based on the review of millions of documents and dozens of interviews, the Examiner concluded:

> [The non-accounting issues] resemble [the accounting issues] in their egregiousness, arrogance and brazenness. These deficiencies reflect a virtual complete breakdown of proper corporate governance principles, making WorldCom the poster child for corporate governance failures. Every level of "gatekeeper" that had the responsibility to promote and ensure proper corporate governance was derelict in its duties to some degree.

*       *       *

> The WorldCom story is not limited to the massive accounting fraud that has been publicly reported. Aside from these issues, the Examiner's continued investigation into other matters has uncovered additional deceit, deficiencies and a disregard for the most basic principles of corporate governance.

8.   In a 10/03 interview with *Bloomberg*, the Examiner (Dick Thornburgh) stated:

> We've looked at a broad spectrum, but obviously the concentration, based on what's already in the public record, is upon the extraordinary relationship between Salomon Smith Barney and WorldCom and its executives, the grants of IPOs on a favorable basis, the activities of Jack Grubman, who persisted in giving euphoric and exaggerated reports about the financial health of WorldCom right up to the edge of the abyss.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 2 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

9.    The manipulations were *enormous and regular*. On 9/26/02, David Myers ("Myers"), the former controller of WorldCom, pleaded guilty to securities fraud charges, admitting he was instructed to falsify records in what became the largest corporate accounting scandal in U.S. history. "I was instructed on a quarterly basis by senior management to ensure that entries were made to falsify WorldCom's books to reduce WorldCom's reported actual costs and therefore to increase WorldCom's reported earnings," Myers told Judge Richard Casey.   The complaint against WorldCom's CFO (defendant Sullivan) and controller (Myers) alleged fraud in connection with the sale of securities, false statements in annual and quarterly SEC reports, false statements to auditors, and false books and records. News reports have disclosed other practices which indicate the falsity of statements made in the Prospectuses/Registration Statements for the Offerings and other statements, including WorldCom's practice of double billing customers and taking excessive merger-related charges to inflate subsequent results. WorldCom also recorded write-downs of $60 billion to reflect impaired assets which have been on the Company's balance sheet at inflated values for years.  In WorldCom's 02 Form 10-K (filed 3/12/04), WorldCom's restated 00 financial statements included $60 million in impairment write-downs which should have been recorded in 00 and 01, but were not. According to a report by Corporate Monitor Richard Breeden, issued in an 8/26/03 Form 8-K:

> When it completes its opening date balance sheet on emergence from bankruptcy, the prior $104 billion in assets is likely to have been reduced to approximately $20 billion. The Company has announced that it believes all its goodwill is permanently impaired (i.e., worthless) in value (if indeed such value ever existed), and that its PP&E should be written down by approximately $29 billion.   In addition, approximately $11 billion in falsely reported profits, included in retained earnings, never actually occurred and must also be written off net of tax effects. Thus, more than 75% of the assets reported on the Company's balance sheet turned out to be accounting helium rather than tangible sources of net worth. From a strict balance sheet perspective, WorldCom's aggregate debt exceeded its tangible asset value by a significant margin during the years the fraud was operating.

10.    The accounting misstatements affected multiple parts of WorldCom's financial statements over many years. The 02 Form 10-K, filed in 3/04, reported that WorldCom's previously reported pre-tax income of $7.6 billion for 00 was actually a loss of $58 billion, and that

WorldCom's previously reported pre-tax income of $2.4 billion for 01 was actually a loss of $17.5 billion.[3]  As the Special Investigative Committee of the Board of Directors of WorldCom described in their 6/9/03 report:

**SUMMARY OF IMPROPER INCOME STATEMENT AMOUNTS BY AREA**
*(millions of dollars)*

| Financial Statements Area | 1999 | 2000 | 2001 | 2002 | TOTAL |
|---|---|---|---|---|---|
| Revenue | 205 | 328 | 358 | 67 | 958 |
| Line Costs | 598 | 2,870 | 3,063 | 798 | 7,329 |
| SG&A | 46 | 283 | 181 | 25 | 535 |
| Other | 89 | 393 | (4) | (50) | 428 |
| TOTAL | 938 | 3,874 | 3,598 | 840 | 9,250 |

(Footnotes omitted.)

11.     The Company's financial statements were likewise misstated due to WorldCom's failure to record impairment of its enormous goodwill on a timely basis.  The Company has now admitted it should have the written off the entirety of its goodwill – $45 billion in 00 and 01.  Had WorldCom recorded even a fraction of the impairment as required by Generally Accepted Accounting Principles ("GAAP") at the time it was evident – prior to the 5/00 and 5/01 offerings – its equity would have been materially lower than it reported in the Registration Statements/Prospectuses, as described herein.

12.     The Registration Statements for the Offerings and subsequent statements were also false and misleading due to the false statements therein about WorldCom's business, acquisitions and the reasons for its purported favorable results.  The Registration Statements concealed the fact that certain of the underwriters had allocated "hot" IPO shares to WorldCom executives in exchange for the right to underwrite the Offerings and receive millions of dollars in fees.  It has now been revealed that one of WorldCom's underwriters, CitiGroup, had loaned hundreds of millions of dollars to an entity controlled by WorldCom's CEO (defendant Ebbers).  The loans were secured by

---

[3]     Before discontinued operations.

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1   WorldCom stock, a fact not disclosed in the offering documents.  This provided additional motive

2   for CitiGroup to help WorldCom conceal its problems.

3          13.      The Bankruptcy Examiner, in the 6/9/03 report, noted manipulations which directly

4   affected purchasers of WorldCom Bonds:

5   •       The Examiner is also concerned about the Company's tendency to utilize its
            debt offerings and credit facilities to further a practice pursuant to which it
6           paid off existing investors or lenders with newly-borrowed funds, while
            growing its debt to a level that became ultimately unserviceable.
7           WorldCom's ability to borrow monies was facilitated by its massive
            accounting fraud, as it allowed the Company to falsely present itself as
8           creditworthy and "investment grade," when in fact its debt was below
            "investment grade."
9
    •       There is no evidence of meaningful debt planning by WorldCom.  Indeed,
10          there is no evidence that Company Management or the Board reasonably
            monitored the Company's debt level or its ability to satisfy its outstanding
11          obligations.  A prime example of inadequate planning was the Company's
            use of the proceeds from a massive $11.9 billion debt offering in May 2001,
12          which WorldCom projected would satisfy its cash needs for the ensuing
            18 months.  In fact, WorldCom spent the proceeds in about eight months.
13
    •       Messrs. Ebbers and Sullivan had virtually unfettered discretion to commit the
14          Company to billions of dollars in debt obligations with virtually no
            meaningful Board oversight.  WorldCom issued more than $25 billion in debt
15          securities in the four years preceding its bankruptcy.  With respect to such
            offerings, Messrs. Ebbers and Sullivan comprised the entirety of the
16          Company's Pricing Committee.  The Board passively "rubber-stamped"
            proposals from Messrs. Ebbers or Sullivan regarding additional borrowings,
17          most often via unanimous consent resolutions that were adopted after little or
            no discussion.
18
19         14.      Plaintiff Western Conference of Teamsters Pension Trust Fund is the largest multi-

20   employer pension plan in the United States.  More than 300,000 Teamsters are covered through

21   pension agreements negotiated by local unions with 2,000 employers in 13 Western states. Plaintiff

22   acquired WorldCom Bonds pursuant to the 5/00 and 5/01 Registration Statements without

23   knowledge of their falsity and has been damaged thereby.

24         15.      Defendants' illegal conduct as alleged herein was undertaken as part of a broad

25   scheme to support what was essentially a gigantic Ponzi operation.  The vast bulk of WorldCom's

26   reported profits were not generated by successful operations, but rather by fictitious and/or bogus

    accounting entries and financial manipulations to create reportable profits where none, in fact,

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933                                        - 5 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1  existed. As a result, WorldCom was constantly starved for cash and the enterprise could be kept
2  afloat only by defendants constantly raising new capital for WorldCom to provide it with the
3  operating cash it desperately needed.

4      16.    WorldCom's huge financial reverses traumatized the markets. In short order,
5  WorldCom stock collapsed, falling to as low as $.05 per share. The impact on the purchasers of
6  WorldCom Bonds was equally catastrophic. As the truth about WorldCom, its operations and its
7  finances reached the market during 02, the price of the WorldCom Bonds collapsed. *The Wall Street*
8  *Journal* referred to the collapse as the "worst bond deal in history." Investors in WorldCom's 5/00
9  bond offering have also lost billions of dollars. The SEC said the restatement of earnings for 01 and
10 the 1stQ 02 showed "improprieties of unprecedented magnitude." Worse yet, WorldCom has now
11 admitted that its financial results for 99-00 were falsified as well.

12     17.    In 6/02 and subsequent months, WorldCom admitted to huge accounting
13 manipulations. As a result of these revelations, WorldCom Bonds plunged in value.

14     18.    On 3/18/04, *Bloomberg* reported that the SEC was investigating whether CitiGroup
15 Inc., J.P. Morgan Chase & Co., Bank of America Corp. and Deutsche Bank AG were aware that
16 WorldCom was a riskier investment than they told investors before a $10 billion bond sale.

17                       **JURISDICTION AND VENUE**

18     19.    The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities
19 Act, 15 U.S.C. §§77k and 77o.

20     20.    Jurisdiction exists pursuant to §22 of the Securities Act, 15 U.S.C. §77v.

21     21.    Venue is proper in Washington pursuant to §22 of the Securities Act and 28 U.S.C.
22 §1391(b) and (c). Many of the acts and practices complained of herein occurred in substantial part
23 in Washington, and defendants offered, advertised, promoted, sold, profited from or materially
24 asserted, aided and participated in the offering, advertising, promotion, sale or realization of profits
25 from the sale of securities in the State of Washington to plaintiff based upon false and materially
26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 6 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1 │ misleading information and materials.  Venue is proper in this District because plaintiff's offices are

2 │ located in this District.

### THE PARTIES

4 │     22.     Plaintiff Western Conference of Teamsters Pension Trust Fund purchased WorldCom

5 │ Bonds, all of which were issued pursuant to the 5/00 and 5/01 Registration Statements, and has

6 │ suffered damages as described in Exhibit A.

7 │     23.     WorldCom is a corporation which was the issuer of the WorldCom Bonds issued

8 │ pursuant to the 5/00 and 5/01 Registration Statements.  WorldCom filed for bankruptcy and is not

9 │ named as a defendant.  Upon emergence, WorldCom changed its legal name to MCI, Inc.

10 │     (a)     Defendant Bernard J. Ebbers ("Ebbers") was, at relevant times, prior to his

11 │ 5/30/02 resignation, President and CEO of the Company. He signed the 5/00 and 5/01 Registration

12 │ Statements.

13 │     (b)     Defendant Scott D. Sullivan ("Sullivan") was, at relevant times, Executive

14 │ Vice President, Chief Financial Officer and a director of the Company. He signed the 5/00 and 5/01

15 │ Registration Statements.  Sullivan has been arrested and indicted for falsifying WorldCom's

16 │ financial status.

17 │     (c)     Each of the named defendants in ¶23(a)-(b) (the "Individual Defendants")

18 │ participated in the Offerings by, among other things, preparing, reviewing and/or signing the

19 │ Registration Statements.

20 │     24.     Defendant CitiGroup, Inc. is a large integrated financial services institution that

21 │ through subsidiaries and divisions (such as defendant Salomon Smith Barney Inc. (collectively

22 │ "CitiGroup")) provides commercial and investment banking services, commercial loans to corporate

23 │ entities, and acts as underwriter in the sale of corporate securities. CitiGroup was an underwriter of

24 │ the WorldCom Bonds sold in 5/00 and 5/01. Defendant Salomon Smith Barney Inc. is liable under

25 │ §11 of the Securities Act and defendant CitiGroup, Inc. is liable under §15 of the Securities Act as a

26 │ control person to subsidiary Salomon Smith Barney Inc.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1      25.     Defendant J.P. Morgan Chase & Co. is an integrated financial services institution that
2 through subsidiaries and divisions (such as defendant J.P. Morgan Securities Inc. (collectively "J.P.
3 Morgan")) provides commercial and investment banking services and advisory services, including
4 acting as underwriter in the sale of corporate securities. J.P. Morgan was an underwriter of the
5 WorldCom Bonds sold in 5/00 and 5/01. Defendant J.P. Morgan Securities Inc. is liable under §11
6 of the Securities Act and defendant J.P. Morgan Chase & Co. is liable under §15 of the Securities
7 Act as a control person to J.P. Morgan Securities Inc.

8      26.     Defendant Bank of America Corp. is a large integrated financial services institution
9 that through its controlled subsidiaries and divisions (such as defendant Banc of America Securities
10 LLC (collectively "Bank America")) provides commercial and investment banking services,
11 commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.
12 Bank America was an underwriter of the WorldCom Bonds sold in 5/00 and 5/01. Defendant Banc
13 of America Securities LLC is liable under §11 of the Securities Act and defendant Bank of America
14 Corp. is liable under §15 of the Securities Act as a control person to Banc of America Securities
15 LLC.

16      27.     Defendant ABN/AMRO Inc. is a large integrated financial services institution that
17 provides commercial and investment banking services, commercial loans to corporate entities, and
18 acts as underwriter in the sale of corporate securities. ABN/AMRO was an underwriter of the
19 WorldCom Bonds sold in 5/01.

20      28.     Defendant Deutsche Bank AG is a large integrated financial services institution that
21 through its controlled subsidiaries and divisions (such as defendant Deutsche Banc Alex. Brown Inc.
22 (collectively "Deutsche Bank")) provides commercial and investment banking services, commercial
23 loans to corporate entities, and acts as underwriter in the sale of corporate securities. Deutsche Bank
24 was an underwriter of the WorldCom Bonds sold in 5/00 and 5/01. Defendant Deutsche Banc Alex.
25 Brown Inc. is liable under §11 of the Securities Act and defendant Deutsch Bank AG is liable under
26 §15 of the Securities Act as a control person to Deutsche Banc Alex. Brown Inc.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

- 8 -

1    29.    Defendant Lehman Brothers Holdings Inc. is a large integrated financial services
2  institution that through its controlled subsidiaries and divisions (such as defendant Lehman Brothers
3  Inc. (collectively "Lehman Brothers")) provides commercial and investment banking services,
4  commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.
5  Lehman Brothers was an underwriter of the WorldCom Bonds sold in 5/00.   Defendant Lehman
6  Brothers Inc. is liable under §11 of the Securities Act and defendant Lehman Brothers Holdings Inc.
7  is liable under §15 of the Securities Act as a control person to Lehman Brothers Inc.

8    30.    Defendant Credit Suisse Group is a large integrated financial services institution that
9  through its controlled subsidiaries and divisions (such as defendant Credit Suisse First Boston Corp.
10  (collectively "Credit Suisse")) provides commercial and investment banking services, commercial
11  loans to corporate entities, and acts as underwriter in the sale of corporate securities.  Credit Suisse
12  was an underwriter of the WorldCom Bonds sold in 5/00.  Defendant Credit Suisse First Boston
13  Corp. is liable under §11 of the Securities Act and defendant Credit Suisse Group is liable under §15
14  of the Securities Act as a control person to Credit Suisse First Boston Corp.

15    31.    Defendant Goldman Sachs Group, Inc. is a large integrated financial services
16  institution that through its controlled subsidiaries and divisions (such as defendant Goldman Sachs &
17  Co. (collectively "Goldman Sachs")) provides commercial and investment banking services,
18  commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.
19  Goldman Sachs was an underwriter of the WorldCom Bonds sold in 5/00.  Defendant Goldman
20  Sachs & Co. is liable under §11 of the Securities Act and defendant Goldman Sachs Group, Inc. is
21  liable under §15 of the Securities Act as a control person to Goldman Sachs & Co.

22    32.    Defendant UBS Warburg LLC ("UBS Warburg") is a large integrated financial
23  services institution that through its controlled subsidiaries and divisions provides commercial and
24  investment banking services, commercial loans to corporate entities, and acts as underwriter in the
25  sale of corporate securities. UBS Warburg was an underwriter of the WorldCom Bonds sold in 5/00.

26

1    33.    Defendant Utendahl Capital Partners, L.P. ("Utendahl") is a financial institution that

2  provides commercial and investment banking services and acts as underwriter in the sale of

3  corporate securities. Utendahl was an underwriter of the WorldCom Bonds sold in 5/01.

4    34.    Defendant Blaylock & Partners, L.P. ("Blaylock") is a financial institution that

5  provides commercial and investment banking services and acts as underwriter in the sale of

6  corporate securities. Blaylock was an underwriter of the WorldCom Bonds sold in 5/00 and 5/01.

7    35.    Collectively defendants named in ¶¶24-34 are referred to as the "Underwriter

8  Defendants." Each bank is sued only for bond offerings in which it participated as an underwriter.

9  Unbeknownst to investors, as described herein, certain of the banks had given WorldCom executives

10  shares of IPO stock in other companies the banks were underwriting in exchange for underwriter

11  business on the very Offerings alleged herein.

12    36.    Defendant Arthur Andersen LLP ("Andersen") was WorldCom's supposedly

13  independent accountant and provided accounting services for WorldCom prior to and in connection

14  with the 5/00 and 5/01 offerings, which included "clean" or "unqualified" opinions on WorldCom's

15  12/31/99 and 12/31/00 financial statements.

16    37.    Many parties played a role in the WorldCom debacle, including those named as

17  defendants herein. As the Bankruptcy Examiner noted in his 6/9/03 report:

18      [T]here are many persons and entities that share responsibility for WorldCom's
       downfall and the losses suffered by the Company's shareholders and creditors.
19      While the degree of responsibility varies greatly, WorldCom could not have failed as
       a result of the actions of a limited number of individuals. Rather, there was a broad
20      breakdown of the system of internal controls, corporate governance and individual
       responsibility, all of which worked together to create a culture in which few persons
21      took responsibility until it was too late.

22  **The Underwriters' Involvement in Selling WorldCom Bonds**
    **Pursuant to the Offerings**
23
24    38.    WorldCom's underwriters were selected not based on competitive criteria but based

25  on the amount of credit the underwriters were willing to extend to WorldCom and based on the

26  ratings the underwriters' analysts had given or would give to WorldCom in a "quid pro quo"

   arrangement, according to the Bankruptcy Examiner's 6/9/03 report. WorldCom management would

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
                                - 10 -

1  tell underwriters that they would have to increase their credit commitments if they wanted roles in
2  the bond deals. One WorldCom manager told a securities firm that "a $300 million commitment [to
3  the credit facility] was not going to get them a top slot" in the offering. The underwriters were so
4  anxious to obtain pieces of the lucrative bond deals that they were willing to increase the amount of
5  credit they would offer WorldCom through revolving lines.

6       39.    WorldCom also selected its underwriters not based on their ability to market the
7  bonds or on competitive pricing, but rather on the ratings which underwriters would have their
8  analysts give WorldCom securities. The Bankruptcy Examiner noted that he had "uncovered
9  evidence demonstrating that the Company openly encouraged its underwriters to discuss WorldCom
10  with their affiliate research analysts." For example, according to the 6/9/03 Bankruptcy Examiner's
11  report, in considering whether to undertake a debt offering, defendant Sullivan told an underwriter
12  that "'your head of debt research ... gives me a very hard time when we access the market more than
13  once a year.'" The underwriter responded: "'I will talk to [him] and set him in the right direction.'"
14  These communications suggest that the underwriter intended to affect the analysis of WorldCom's
15  securities, and the rating given by the analyst. The bankers, especially J.P. Morgan and CitiGroup,
16  fulfilled their intended roles as cheerleaders for WorldCom securities, issuing extremely positive
17  reports.

18       40.    The underwriting fees to be derived from the bond offerings were so lucrative that the
19  underwriters were willing to extend or increase credit to WorldCom notwithstanding the fact that:
20  (a) the Company was still funding part of its operations with borrowed money; (b) the Company was
21  not cash-flow positive; and (c) the Company had recently acquired numerous other companies that
22  had not yet been integrated into the Company. The banks were also willing to issue positive reports
23  on WorldCom securities which facilitated the Offerings. The underwriting fees for the 5/00 and
24  5/01 offerings totaled $85 million.

25       41.    CitiGroup's involvement was particularly egregious. In the late 90s, CitiGroup
26  became the highest earning banker in the telecom industry with hundreds of millions of dollars in

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 11 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1 fees for underwriting services and financial advice in connection with mergers. Since 97, Salomon
2 Smith Barney was either banker or advisor to some 80 telecommunications companies which raised
3 nearly $200 billion in debt and equity, for which Salomon Smith Barney was paid more than
4 $800 million in fees for underwriting and more than $175 million in fees for financial advising
5 services relating to mergers and acquisitions. Many of these fees were generated by virtue of what
6 New York Attorney General Elliot Spitzer described as "commercial bribery," including the
7 "spinning" activities described herein.

8     42.    In addition to spinning activities, CitiGroup also used another mechanism to win
9 banking business – namely selling supposedly "independent" analyst research reports and ratings in
10 exchange for investment banking business. Although investment banks, including CitiGroup, have
11 long assured investors that their investment banking and research departments are separated by a so-
12 called "Chinese Wall" to prevent conflicts of interest, in fact, the two sides of the business worked
13 hand in hand to win business.

14     43.    CitiGroup delivered the desired research coverage of telecom companies – analyst
15 reports written by star analyst Jack Grubman ("Grubman"). His glowing reports on WorldCom
16 included those noted herein. Grubman was so close to Ebbers that he attended board meetings.
17 Grubman was an advisor. CitiGroup benefited greatly from his positive statements about
18 WorldCom, yet his conflicts of interest were real and affected his research. Note the comments of
19 CitiGroup's retail sales force regarding Grubman:

20     &bull;    "Poster child for conspicuous conflicts of interest."

21     &bull;    "Very disturbed by his lack of foresight on the industry decline and its affect on the
22     companies he follows. Suspect a conflict of interest in his ratings between us in the
retail sales side and the investment banking side."

23     &bull;    "Let him be a banker, not a research analyst. He is 'the closest to the source' on
24     most of the companies he follows he still can't anticipate anything but a banking fee.
He's a joke."

25     &bull;    "Epitomizes the 'Buy high sell low' ideal. The worst to come along in a long time
    for the retail sales force. Sandy should not allow Mr. Grubman to have anything to
26     do with the retail distribution system. Grubman is an example of all that is wrong
with mixing research and investment banking in the same person or staff."

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

– 12 –

- "Should be removed from any contact with the retail system. He has caused more damage and ill will than any analyst in history. I will never follow another Grubman recommendation."

- "Investment banker, or research analyst? He should be fired."

- "No Chinese wall between retail and investment banking."

- "His ridiculously bullish calls on WCOM & GX cost our clients a lot of money. Other than the investment banking fees he brings in, I don't understand how a person who is so bad at his job and so wrong on stocks he covers could still have a job."

- "So wrong, so often. Obvious banking conflicts of interest."

- "Come on – please don't call his work 'analyst.' He's a banker and should not write reports used by retail. He should not publish reports, let an associate do it under their name and offer their opinion and not Jack's."

44.     Grubman consistently issued "Buy" recommendations on stocks due to investment banking business he hoped to win. Grubman's positive reports omitted the spinning of the IPO shares Grubman and CitiGroup utilized to win business and failed to disclose that CitiGroup's positive coverage was a quid pro quo for winning lucrative underwriting business. In documents produced by CitiGroup to the New York State Attorney General, Grubman admitted in an internal e-mail that he failed to timely downgrade certain stocks solely because of the pressure from his investment banking colleagues. In a 6/01 e-mail to Kevin McCaffrey, Salomon Smith Barney's head of U.S. research management, Grubman observed:

> [M]ost of our banking clients are going to zero and you know *I wanted to downgrade them months ago but got huge pushback from banking*. I wonder of what use bankers are if all they can depend on to get business is analysts who recommend their banking clients.

45.     At that same time, Grubman had e-mailed a research colleague about an upcoming dinner meeting at which he expected to hear two senior investment bankers complain about some of his recent commentary on telecom stocks. Grubman vented: "Screw [the investment bankers]. We should have put a Sell on everything a year ago." In a 5/01 e-mail Grubman admitted to a member of his research team: "If anything the record shows we support our banking clients too well and for too long."

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 13 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

46.     CitiGroup has admitted to Congress that Grubman's compensation was linked to the investment banking revenues he generated.  He received "helper's fees" as a percentage of the investment banking fees generated by the transactions which he generated.  For 01, Grubman identified nearly 100 investment banking transactions in which he was involved on his annual review which generated fees of $166 million.

47.     As *Time* magazine reported on 11/25/02:

> Grubman's first job was in strategic planning at AT&T. He later became an analyst at PaineWebber but made his name at Salomon pounding the table for WorldCom in the mid-'90s, with the stock trading in the teens. As it rose to its high near $62 in 1999, so did Grubman's reputation, and his relationship with Ebbers got downright cozy – Grubman even attended Ebbers' wedding that year. "Grubman was solicitous, fawning, like a groupie," says a source close to the WorldCom board. "This was not a natural friendship." And as Grubman's star rose with Ebbers', so has it fallen just as quickly.

48.     The extent of Grubman's influence at WorldCom is shown by WorldCom's possible acquisition of Nextel in 4/99.  Describing the reactions he had heard during visits with several large institutional investors, Grubman expressed doubts about the Nextel deal.  Two days later, WorldCom disclosed it would not buy Nextel.

49.     CitiGroup and Grubman also played a role in advising WorldCom on how to respond to issues publicly.  As WorldCom stock declined in early 02, there were rumors about the Company's accounting and liquidity.  On 2/7/02, WorldCom held a conference call in which Ebbers responded to the rumors, stating: "[W]e stand by our accounting" and "[t]o question WorldCom's viability is utter nonsense."  "I highly recommend everyone step back and focus on reality rather than the fear factor."

50.     In fact, prior to this call, Grubman had advised Ebbers and Sullivan on what to say on the call.

51.     On 2/4/02, Grubman e-mailed Ebbers with a "List" of items for the call.

Below is list of issues that should be addressed head on Thursday's call:

1.     Liquidity issues.  Should talk about how you guys have no problem meeting maturities.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 14 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

2.     Off-balance sheet stuff.  Discuss how securitization of accounts receivable not new and does not impact improving period to period free cash flow.

3.     Integrity of accounting – big issue. Investors will worry that some bombshell will come out in the 10K. People want to know that what you see is what you get.

*          *          *

Give me call if you want to follow-up.

Hang in there.

Jack.

52.     On 2/7/02 Grubman e-mailed Sullivan about a potential question he planned to ask during the conference call if Grubman would get the "right answer."

Also, if ask you if you can hold EBITDA margin of Q4 of 02 given 3% type growth will I get right answer? If so, then despite lower rev growth cash flow target can be met.

53.     Grubman also helped Ebbers and Sullivan respond to internal questions.  When a financial manager within WorldCom, Stephen Rubio, wrote an e-mail to Grubman in 10/01 asking how Grubman had calculated certain working capital figures in a recent report about WorldCom, Grubman forwarded the e-mail to Sullivan, who later told Rubio only to communicate with investor relations.

54.     Grubman's reports were tremendously important to the value of WorldCom's securities.

55.     On 3/14/01, WorldCom shares rose 8% on huge volume of 75 million shares after Grubman boasted about his 01 sales estimate for the Company's unit that sells data and Internet data services. In 2/02, after the 2/7/02 conference call, Grubman's positive report caused WorldCom's stock to increase 15% in one day.

56.     CitiGroup also helped Ebbers profit from the inflation on WorldCom's stock price caused in part by Grubman's false reports.  In the fall of 00, CitiGroup arranged a forward sales contract for 30 million shares of Ebbers' WorldCom stock so he could lock in gains on the stock.

57.   This close relationship paid off for CitiGroup, as CitiGroup received lead underwriting positions in WorldCom's 5/00 and 5/01 bond offerings. CitiGroup also received tens of millions of dollars as a financial advisor to WorldCom, including on its acquisition of MCI in 98.

**Arthur Andersen's False Statements**

58.   Arthur Andersen issued unqualified opinions on WorldCom's 99-00 financial statements.   Andersen also consented to be named as an expert in the Registration Statements/Prospectuses pursuant to the 5/00 and 5/01 offerings. Andersen was actually aware of many of the issues that caused the restatement, including the line cost issues and the recording of intercompany transactions. In 99, Andersen noted the possibility that the Company was misstating its line costs and that it could manipulate business processes to achieve financial targets. In 00, Andersen identified the risk of credit defaults in residential and commercial accounts as well as fluctuation in currency. WorldCom was rated a maximum risk client which made it incumbent on Andersen to increase the scope of its audit. Despite these risk factors, when issues would come to Andersen's attention, most were resolved with reliance on the "integrity of management." Despite the increased risk, the examiner found that for many financial statement line items the only substantive tests performed by Andersen were analytical in nature and did not involve analyzing underlying documentation. Andersen did not document the results of its work for many substantive tests.

59.   A major risk factor which did not cause Andersen to change its audit opinion was when Andersen was denied access to general ledgers and journals and was only given printouts from certain of the ledgers. The Bankruptcy Examiner noted:

> Indeed, the engagement manager at one point specifically instructed his staff to conform with the Company's limitations because the Company was a high profile client and because the support of Management was important especially since the Company was contemplating a merger with Sprint and Sprint's external auditors would likely be competing to obtain the engagement for the WorldCom audit.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 16 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1    60.    Despite being limited in the scope of its audits, Andersen issued unqualified opinions

2  on WorldCom's financial statements for 99-01. Andersen considered WorldCom a "flagship" client

3  and a "crown jewel" of its firm. As the Special Investigative Committee noted:

4          In terms of the total amount of fees charged to clients, WorldCom was one of
        Andersen's top 20 engagements in 2000, and the largest client of its Jackson,
5        Mississippi, office.    From 1999 through 2001, WorldCom paid Andersen
        $7.8 million in fees to audit the financial statements of WorldCom, Inc.; $6.6 million
6        for other audits required by law in other countries; and about $50 million for
        consulting, litigation support, and tax services.[4]   Andersen had not been MCI's
7        external auditor before its merger with WorldCom; however, after the merger,
        Andersen audited the consolidated financial statements of MCI, WorldCom, and their
8        subsidiaries. In a May 20, 1999 presentation, Andersen told the Audit Committee
        that the fees charged for the combined company "remain[ed] significantly lower than
9        the former separate fees of the companies." Andersen's staff had the equivalent of
        approximately 10 to 12 people working full-time auditing WorldCom's books. For
10       its 2001 audit, Andersen's team spent roughly 15,000 hours on the audit and charged
        $2 million.

11                                 *       *       *

12

13          In our view, and based on the incomplete record available to us, Andersen
        failed to detect the accounting irregularities in part because there were defects in
14       Andersen's application of the controls-based audit approach. Andersen concluded –
        mistakenly in this case – that, year after year, the risk of fraud was minimal and thus
15       it never devised sufficient auditing procedures to address this risk.... Andersen
        conducted only very limited auditing procedures in many areas where we found
16       accounting irregularities. Even so, Andersen still had several chances to uncover
        problems we identified in this Report.

17                          **THE 5/00 AND 5/01 OFFERINGS**

18    61.    The Registration Statements/Prospectuses for the Offerings included or incorporated

19  by reference additional false and misleading narrative statements.   WorldCom's Registration

20  Statements/Prospectuses used to sell the WorldCom Bonds purchased by plaintiff incorporated by

21  reference other filings:

22

23

24

_____

25  [4]    Many of the non-audit services that Andersen had provided WorldCom are now restricted or prohibited by
26  Section 21(a) of the Sarbanes-Oxley Act and the SEC's rule enhancing auditor independence.

COMPLAINT FOR VIOLATION OF THE                    Lerach Coughlin Stoia Geller Rudman & Robbins LLP
SECURITIES ACT OF 1933                                  700 Fifth Avenue, Suite 5600, Seattle, WA  98104
                                    - 17 -              Telephone: 206/749-5544 • Fax: 206/749-9978

| Date of Offering | Description of Offering | Incorporation of WorldCom SEC Filings |
|---|---|---|
| 5/12/00 | 7.875% Notes due 2003<br>8.000% Notes due 2006<br>8.250% Notes due 2010 | 99 10-K, 1stQ 00 10-Q[5] |
| 5/9/01 | 5/9/01  6.5% Notes due 2004<br>7.5% Notes due 2011<br>8.25% Notes due 2031<br>Euro 6.75% Notes due 2008<br>Sterling 7.25% Notes due 2008 | 00 10-K, 8-Ks dated 4/26/01, containing press release for 1stQ 01 results, and 5/1/01 |

62.     As noted herein, these Forms 10-K, 10-Q and 8-K contained WorldCom's admittedly false financial statements. These financial statements overstated WorldCom's revenues and earnings by billions of dollars. These documents also contained false forward-looking statements which misstated WorldCom's prospects and demand for WorldCom's products and services. Defendants also disseminated other false statements subsequent to the Registration Statements/Prospectuses which artificially inflated the price of these bonds sold in the after market.

**Background**

63.     WorldCom was formed in 83 as LDDS, Inc. and due to acquisitions became one of the largest companies in the world within 15 years. In 96, the Telecommunications Act increased competition among telecommunications companies by removing barriers for long distance carriers to provide local services and vice versa. At the same time, WorldCom continued its rapid acquisition pace putting pressure on its assets, its capital, its personnel and its internal controls for accounting purposes. The Company also sought to portray itself as rapidly growing and projected favorable earnings in future years. The integration of these new companies burdened the Company's ability to present financial statements in accordance with GAAP and also provided a manner for the Company to manipulate its reported earnings by improperly increasing acquisition charges.

---

[5]     The Registration Statement/Prospectus also incorporated all documents WorldCom filed pursuant to §§13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 ("Exchange Act") after the date of the Prospectus and before the offering was completed.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

- 18 -

64.    During 95-99, WorldCom, under the leadership of its founder and CEO Ebbers, expanded very rapidly into a telecommunications giant with reported revenue, net income and earnings per share ("EPS") growth as shown below:

|            | 95     | 96      | 97     | 98        | 99        |
|------------|--------|---------|--------|-----------|-----------|
| Revenue    | $3.70B | $4.49B  | $7.35B | $17.678B  | $33.341B  |
| Net Income | $266M  | $414M*  | $357M  | $1.085B*  | $3.865B   |
| EPS        | $0.43  | $1.01*  | $0.40  | $0.85*    | $1.38     |

*Excludes acquisition-related charges.

This growth was achieved largely by WorldCom making over 70 acquisitions – using its common stock – including the acquisitions of MFS Communications Co., UUNet Inc., CompuServe, MCI Communications, SkyTel Communications and CAI Wireless.

**The 5/00 Offering**

65.    By the spring of 00, WorldCom's liquidity was impaired and it needed to raise cash to pay down its mounting commercial paper debt. On 5/12/00, WorldCom and its investment bankers (J.P. Morgan, CitiGroup, Bank America, Deutsche Bank, Credit Suisse, Lehman Brothers, Goldman Sachs, Blaylock and UBS Warburg) sold $3.5 billion in bonds – $1.0 billion of 7.875% notes due 2003, $1.25 billion of 8.0% notes due 2006, and $1.25 billion of 8.25% notes due 2010.  The investment bankers pocketed $15 million in fees from the sale of these bonds, while WorldCom got the cash it needed to pay off its commercial paper debt and restore its liquidity.

66.    As part of the process of preparing the 5/00 Registration Statement, the Underwriter Defendants purportedly conducted an adequate and reasonable investigation into the business and operations of WorldCom, an undertaking known as a "due diligence" investigation, but in fact, did not do so. During the course of their "due diligence," the banks had continual access to confidential corporate information concerning WorldCom's business, financial condition, internal controls and its future business plans and prospects and learned of or should have learned of the falsification of WorldCom's financial condition and results and the other false and misleading statements in the 5/00 Registration Statement.  Also, as a result of their status as standby lenders for WorldCom on the

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 19 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1  commercial paper back-up facilities, the banks had access to WorldCom's true financial condition,
2  and knew or should have known it was much worse than publicly presented, which is why the banks
3  wanted to avoid having WorldCom draw down on those credit facilities.

4      67.     The data below shows the bonds sold in the 5/00 offering and the monies received by
5  WorldCom and the underwriter banks:

| | Public Offering Price | Underwriting Fees | Proceeds to WorldCom |
|---|---|---|---|
| Floating Rate Notes | $1,500,000,000 | $ 2,250,000 | $1,497,750,000[6] |
| 7.875% Notes | $ 995,410,000 | $ 2,500,000 | $ 992,910,000 |
| 8.000% Notes | $1,236,687,500 | $ 4,687,500 | $1,232,000,000 |
| 8.250% Notes | $1,231,112,500 | $ 5,625,000 | 1,225,487,500 |
| **Combined Totals** | **$4,963,210,000** | **$15,062,500** | **$4,948,147,500** |

68.     In connection with the 5/00 offering, WorldCom filed a Registration Statement with
the SEC which became effective on 5/12/00. That Registration Statement contained materially false
statements and material omissions, and included WorldCom's false financial statements for the year
ended 12/31/99 and the 1stQ 00. These financial statements artificially inflated WorldCom's assets,
net income, EPS and cash flows from operations – and associated financial ratios, including its ratio
of earnings to fixed charges. WorldCom artificially inflated its revenues and earnings by improperly
booking sales, improperly capitalizing ordinary operating costs, failing to write down assets
(goodwill) due to the impaired value of earlier acquisitions, improperly re-classifying assets of
companies it acquired to lengthen their amortization periods, taking excessive "one-time" acquisition
charges that it later secretly used to boost its "operating" earnings, failing to timely record refunds
due customers and by improperly accounting for receivables it could not collect.

---

[6]     The Floating Rate Notes matured in 01 prior to WorldCom's bankruptcy.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 20 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

69.     Because these bonds would be sold for the most part to sophisticated institutional investors, it was necessary for such a bond offering for WorldCom to appear to have sufficiently large assets and earnings power to be able to pay the huge interest payments that would be due on these bonds, and that WorldCom's assets and earnings power were sufficient to retire the bonds when they became due.  Maintaining WorldCom's investment-grade credit rating was absolutely indispensable to successfully completing the bond offering.  Thus, WorldCom's financial position and results at 12/31/99 and 3/31/00 as presented in the 5/00 Registration Statement appeared to be very strong and consistent with its investment-grade credit rating, as set forth below:

| | Year Ended 12/31/99 | Quarter Ended 3/31/00 |
|---|---|---|
| Total assets | $91.0 billion | $94.5 billion |
| Revenue | $37.1 billion | $ 9.98 billion |
| Operating income | $ 7.8 billion | $ 2.4 billion |
| Diluted EPS | $1.35 | $0.44 |
| Ratio earnings/ Fixed charges | 5.75:1 | 7.01:1 |

70.     The 5/00 Registration Statement contained the following WorldCom financial results:

| (in millions, except for per share data) | At or For the Three Months Ended 3/31, (unaudited) | | At or For the Year Ended 12/31, |
|---|---|---|---|
| | 2000 | 1999 | 1999 |
| OPERATING RESULTS: | | | |
| Revenues | $9,978 | $9,122 | $37,120 |
| Operating income (loss) | 2,440 | 1,510 | 7,888 |
| Income (loss) before cumulative effect of accounting change and extraordinary items | 1,301 | 730 | 4,013 |
| Net income (loss) applicable to common shareholders | 1,284 | 712 | 3,941 |
| EARNINGS (LOSS) PER COMMON SHARE: | | | |
| Net income (loss) – | | | |
| Basic | 0.45 | 0.25 | 1.40 |
| Diluted | 0.44 | 0.24 | 1.35 |

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 21 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

FINANCIAL POSITION:

|  |  |  |  |
|---|---|---|---|
| Total assets | $94,512 | | $91,072 |
| Long-term debt | 13,514 | | 13,128 |
| Shareholders' investment | 53,052 | | 51,238 |
| Ratio of earnings to fixed charges* | 7.01:1 | 3.96:1 | 5.75:1 |

\- - - - - - - - -

\* For the purpose of computing the ratio of earnings to fixed charges, earnings consist of pretax income (loss) from continuing operations, excluding minority interests in losses of consolidated subsidiaries, and fixed charges consist of pretax interest, including capitalized interest, on all indebtedness, amortization of debt discount and expense, and that portion of rental expense which WorldCom believes to be representative of interest.

71.    The 5/00 Registration Statement contained the following WorldCom/Sprint pro forma financial results:

Unaudited Pro Forma Condensed Combined Balance Sheet
As of 3/31/00
(in millions)

|  | WorldCom Historical | Sprint Historical | Pro Forma Adjustments | WorldCom Pro Forma Combined |
|---|---|---|---|---|
| Current assets | $11,110 | $ 4,988 | -- | $ 16,098 |
| Property, plant & equipment, net | $30,909 | $22,432 | – | $ 53,341 |
| Goodwill & PCS licenses, net | $42,865 | $ 8,406 | (8,406) 107,602 | $150,467 |
| Other intangibles, net | $ 4,304 | $ 1,123 | – | $ 5,427 |
| Other assets | $ 5,324 | $ 1,765 | – | $ 7,089 |
| Total assets | $94,512 | $38,714 | $ 99,196 | $232,422 |
| Total shareholders' equity | $53,052 | $14,223 | $ 99,196 | $166,471 |
| Total liabilities & shareholders' equity | $94,512 | $38,714 | $ 99,196 | $232,422 |

Unaudited Pro Forma Condensed Combined Statement of Operations
For the Three Months Ended 3/31/00
(in millions, except per share data)

|  | WorldCom Historical | Sprint FON Historical | Pro Forma Adjustments | WorldCom Pro Forma Combined |
|---|---|---|---|---|
| Revenues | $ 9,978 | $ 4,397 | $ (133) | $14,242 |
| Operating expenses: | | | | |
| Line costs | $4,092 | $2,031 | – | $ 5,990 |
| Selling, general & administrative | $2,299 | $1,063 | | $ 3,362 |

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 22 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

| | | | | |
|---|---|---|---|---|
| Net income (loss) Applicable to common shareholders before discontinued operations & extraordinary items | $1,284 | $  447 | $  (731) | $ 1,000 |
| Earnings (loss) per share – | | | | |
| Basic | $   0.45 | $   0.51 | | $   0.23 |
| Diluted | $   0.44 | $   0.50 | | $   0.22 |

Unaudited Pro Forma Condensed Combined Statement of Operations
For the Year Ended 12/31/99
(in millions, except per share data)

| | WorldCom Historical | Sprint Historical | Pro Forma Adjustments | WorldCom Pro Forma Combined |
|---|---|---|---|---|
| Revenues | $37,120 | $17,016 | $  (536) | $53,600 |
| Operating expenses: | | | | |
| Line costs | $15,951 | $ 7,724 | $  (536) | $23,139 |
| Selling, general & administrative | $ 8,935 | $ 4,233 | – | $13,168 |
| Operating income (loss) | $ 7,888 | $ 2,930 | $(2,923) | $ 7,895 |
| Earnings (loss) per share: | | | | |
| Basic | $   1.40 | $   2.01 | | $   0.64 |
| Diluted | $   1.35 | $   1.97 | | $   0.62 |

72.     Based on WorldCom's apparent huge asset base and strong historical earnings, the WorldCom Bonds as presented in the 5/00 Registration Statement filed with the SEC to sell these "investment-grade" bonds appeared to be a very safe investment.  The Registration Statement contained no risk factors with respect to investment in the WorldCom Bonds.  The Registration Statement presented WorldCom as having over $94 billion in assets, as being very profitable and as having an "earnings-to-fixed-charges ratio" at 12/31/99 – the key financial measure of the safety of a debt issuance – of 5.75 to 1, a very strong ratio.

73.     The 5/00 Registration Statement also contained Sprint's 1stQ 00 results:

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 23 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

Unaudited Pro Forma Condensed Combined Statement of Operations
For the Three Months Ended 3/31/00
(in millions, except per share data)

|  | Sprint FON Historical |
|---|---|
| Revenues | $  4,397 |
| Operating expenses: |  |
|   Line costs | 2,031 |
|   Selling, general & administrative | 1,063 |
| Net income (loss) |  |
|   Applicable to common shareholders before discontinued operations & extraordinary items | $    447 |
| Earnings (loss) per share – |  |
|   Basic | $  0.51 |
|   Diluted | $  0.50 |

74.    In addition to these favorable financial results, the 5/00 Registration Statement incorporated the 99 Form 10-K, which also presented other favorable aspects of WorldCom's business:

> Line costs as a percentage of revenues for 1999 were 43.0% as compared to 47.0% reported for the same period in the prior year.  Overall decreases are attributable to changes in the product mix and synergies and economies of scale resulting from network efficiencies achieved from the continued assimilation of MCI, CompuServe Network Services and ANS into the Company's operations.

75.    The Registration Statement/Prospectus incorporated by reference the 99 Form 10-K which discussed MCI's anticipated future results:

> *As of the allocation date, total MCI stand-alone revenues were projected to exceed $34 billion within five years.  This level of revenue implied a compound annual growth rate ("CAGR") of approximately 12.3%.*

> \*    \*    \*

> At the time of the allocation, total ANS and CompuServe Network Services stand-alone revenues were projected to exceed $3.5 billion within five years.  This level of revenues implied a CAGR of approximately 32%.

76.    The 5/00 Registration Statement/Prospectus also incorporated by reference the 1stQ 00 Form 10-Q which stated in part:

> Revenues for the three months ended March 31, 2000, increased 9.4% to $10.0 billion as compared to $9.1 billion for the three months ended March 31, 1999.  The increase in total revenues is attributable to internal growth of the Company.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 24 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

*     *     *

Line costs as a percentage of revenues for the first quarter of 2000 were 41.0% as compared to 45.3% reported for the same period of the prior year. This improvement is a result of more traffic and revenues that have no associated access charges, declining access and settlement costs, improved interconnection terms in Europe and network efficiencies associated with the MCI merger and sale of SHL. Additionally, access charge reductions that occurred in July 1999 and January 2000 reduced total line cost expense by approximately $124 million for the first quarter of 2000. While access charge reductions were primarily passed through to customers, line costs as a percentage of revenues were positively affected by over half a percentage point for the first quarter of 2000.

*     *     *

WorldCom cannot predict the outcome of [regulations regarding access charges] proceedings or whether or not the results(s) will have a material adverse impact on its consolidated financial position or results of operations. However, the Company's goal is to manage transport costs through effective utilization of its network, favorable contracts with carriers and network efficiencies made possible as a result of expansion of the Company's customer base by acquisitions and internal growth.

Selling, general and administrative.   Selling, general and administrative expenses for the first quarter of 2000 were $2.3 billion or 23.0% of revenues as compared to $2.4 billion or 26.0% of revenues for the first quarter of 1999. The improvement in selling, general and administrative expenses is a result of a better mix of revenues, having scale in the Company network and the Company's ability to leverage certain staff areas such as information technology and engineering groups over a larger base of revenues.

77.   In fact, the reason for WorldCom's supposed improvement in line costs and SG&A expenses was the Company's financial manipulations, including improper capitalization and utilizing accrued liabilities to manage earnings in violation of GAAP, described herein.

78.   The 5/00 Registration Statement also made it appear likely that the Department of Justice ("DOJ") would approve WorldCom's acquisition of Sprint. It stated:

Consummation of the Sprint merger is subject to various conditions set forth in the merger agreement with Sprint, including the adoption of the merger agreement by stockholders of Sprint, the approval of the Sprint merger by shareholders of WorldCom, the approval of the issuance of WorldCom capital stock in the Sprint merger by shareholders of WorldCom, certain U.S. and foreign regulatory approvals and other customary conditions.   On April 28, 2000, special meetings of the shareholders of WorldCom and Sprint were held and the merger proposals were adopted and approved.   It is anticipated that the Sprint merger will close in the second half of 2000.   Additionally, if the Sprint merger is consummated, the integration and consolidation of Sprint would require substantial management and financial resources and involve a number of significant risks, including potential

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933                                     - 25 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

difficulties in assimilating technologies and services of Sprint and in achieving anticipated synergies and cost reductions.

79.    In fact, the Sprint merger faced significant regulatory hurdles and its consummation was highly suspect. WorldCom's stock had appreciated significantly on the news and would decline if the merger was blocked. The decline in WorldCom's stock price would make (and did make) the Company's debt securities less attractive.

80.    These statements were false and misleading as they concealed that the reason for WorldCom's favorable financial results was the Company's accounting improprieties. Moreover, the Company's earnings would be much worse than forecast once the accounting improprieties were revealed. Contrary to these statements, WorldCom did not have all the capabilities represented but was falsely portraying itself through various financial manipulations described herein, and its "internal growth" was not nearly as strong as represented. Any forward looking statements included *or incorporated in the Registration Statement/Prospectus are not protected by the "safe harbor" since this was the first time these bonds had been offered to the public as described in ¶227.* Nonetheless, WorldCom was successful in completing the 5/00 offering, raising $4.9 billion in proceeds.

81.    By the time of this offering, loans to Ebbers' personal holding company, Joshua Timberlands, by a CitiGroup entity (Travelers Insurance) had reached $679 million, as described in ¶117. Despite CitiGroup's role as lead underwriter, this loan was not disclosed.

82.    In addition to availing themselves of virtually unbridled access to WorldCom's internal corporate information, the banks met with WorldCom's management, top executives and Andersen and engaged in "drafting sessions" prior to completing the 5/00 Registration Statement. During these sessions, consensus was reached as to: (i) the strategy to best accomplish the 5/00 offering; (ii) the terms of the 5/00 offering, including the price at which WorldCom Bonds would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about WorldCom would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 26 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

83.    As is the case with any large commercial paper borrower, WorldCom had in place a commercial paper back-up credit facility, *i.e.*, in WorldCom's case a $12 billion unsecured lending commitment from its banks (J.P. Morgan, CitiGroup, Bank America, Deutsche Bank and ABN/AMRO), which permitted it to draw down on that facility to pay off its commercial paper debt if necessary. However, this line had never been drawn down upon, enabling WorldCom's lending banks to sit back and comfortably collect a commitment fee of .25%, or approximately $25-$30 million per year, monies they pocketed without incurring any actual credit risk exposure to WorldCom.

84.    However, if WorldCom began to draw down on its commercial paper back-up facility, this would put the banks very much at risk of a major loss, as they knew from their long association with WorldCom and involvement in its financial and business affairs that WorldCom's actual financial condition was far, far worse and much more highly leveraged and dangerous than had been publicly disclosed. While the banks would have received interest payments on the loans had the facility been drawn down upon, interest rates at that time were very low and commercial lending was the least profitable part of these banks' operations. Thus, these interest rates could not possibly adequately compensate the banks for the true credit risk they knew they would be taking in making billions of dollars of loans to WorldCom. The banks received the following amounts of the underwriting fees for their participation in the offering:

| | |
|---|---|
| CitiGroup | $ 6.0 million |
| J.P. Morgan | $ 5.6 million |
| Bank America | $ 1.1 million |
| Deutsche Bank | $  .2 million |
| Lehman Brothers | $ 1.1 million |
| Credit Suisse | $  .2 million |
| Goldman Sachs | $  .2 million |
| UBS Warburg | $  .2 million |

### The 5/01 Offering

85.    By the end of 00, WorldCom stock collapsed, falling to just $13-1/2 due to weak 3rdQ 00 earnings and the failure to complete the Sprint merger. To make matters worse, during the last half of 00, price competition in the long-distance business intensified, raising investor concerns

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 27 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1    as to the long-term profitability of long-distance providers like WorldCom's MCI subsidiary. Also,

2    by year-end 00, WorldCom in fact was facing a cash flow/liquidity crisis.  Because most of

3    WorldCom's reported profits continued to be "cash-less," *i.e.*, were due to accounting manipulations

4    like secretly drawing down on excess reserves created in connection with previous acquisitions,

5    lengthening the amortization period of assets to reduce current depreciation charges, and improperly

6    capitalizing operating costs and the like, WorldCom's operations were not generating sufficient cash

7    to support the Company's expanding operations.  WorldCom had been falsifying its financial results

8    for years; thus, WorldCom's 99 and 00 results were false in material respects.  WorldCom artificially

9    inflated its revenues and earnings by improperly booking sales, improperly capitalizing software and

10   "line" costs that were ordinary operating expenses, failing to write down assets (goodwill) due to the

11   impaired value of earlier acquisitions, improperly classifying assets of companies it acquired to

12   lengthen their amortization periods, taking excessive "one-time" acquisition charges that it later

13   secretly used to boost its "operating" earnings, failing to properly and timely account for customer

14   refunds due to overcharges and improperly failing to write off receivables it could not collect.  These

15   accounting tricks overstated WorldCom's reported assets, operating earnings, cash flow and EPS.

16          86.     To make matters worse, in late 00/early 01, due to the collapse of WorldCom stock,

17   Ebbers (WorldCom's founder and CEO), defaulted on a $350+ million margin loan he had secretly

18   taken out earlier in 00 from Bank America, secured by millions of shares of his WorldCom stock.

19   To bail himself out, Ebbers forced WorldCom to pay off and thus assume his huge margin loan,

20   further exacerbating WorldCom's cash flow/liquidity problem, and putting enormous pressure on

21   Ebbers and the entire WorldCom Board to shore up WorldCom's financial condition to help support

22   its stock price so it would not decline any further.

23          87.     As a result of WorldCom's cash flow problems, by late 00/early 01, WorldCom's

24   commercial paper and other short-term debt had ballooned to by far its highest levels ever, *i.e.*, $9-

25   $10 billion, and while WorldCom had been able to borrow in the commercial paper market because

26   its apparent huge asset base and strong earnings power entitled it to an "investment-grade" credit

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 28 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1  rating, by late 00/early 01, WorldCom's short-term debt had reached such levels that WorldCom's

2  ability to continue to expand its borrowing in this market was at or near an end.

3       88.     While WorldCom had in place a commercial paper back-up facility, *i.e.*, a $12 billion

4  unsecured lending commitment from its banks (J.P. Morgan, CitiGroup, Bank America, Deutsche

5  Bank and ABN/AMRO), which permitted it to draw down on that facility to pay off its commercial

6  paper debt if necessary, that line had never been drawn down upon, enabling WorldCom's lending

7  banks to sit back and comfortably collect a commitment fee of .25%, or approximately $25-$30

8  million per year, monies they pocketed without incurring any actual credit risk exposure to

9  WorldCom.

10       89.     The banks knew, however, that if WorldCom began to draw down on its commercial

11  paper back-up facility, this would put the banks very much at risk of a major loss, as they knew from

12  their long association with WorldCom and involvement in its financial and business affairs that

13  WorldCom's actual financial condition was far, far worse and much more highly leveraged and

14  dangerous that had been publicly disclosed. While the banks would have received interest payments

15  on the loans had the facility been drawn down upon, interest rates at that time were very low and

16  commercial lending was the least profitable part of these banks' operations. Thus, these interest

17  rates could not possibly adequately compensate the banks for the true credit risk they knew they

18  would be taking in making billions of dollars of loans to WorldCom.

19       90.     By early 01, WorldCom desperately needed to raise cash to restore its liquidity by

20  paying down its commercial paper and other short-term debt. However, WorldCom's banks did not

21  want WorldCom to borrow from them. So WorldCom and its banks began to quickly work together

22  to find a way to raise the capital WorldCom needed – but from public investors. Since WorldCom's

23  common stock had collapsed, a sale of equity was out of the question as it would have been grossly

24  dilutive. So it was decided to undertake a massive bond offering – the largest corporate bond

25  issuance in the history of the United States and a bond offering that could only be accomplished if

26  the WorldCom Bonds to be sold were rated "investment grade" by the rating agencies and

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

- 29 -

1  WorldCom's financial condition appeared to be very strong and its overall business succeeding,

2  despite intensifying long-distance price competition.

3      91.    During early 01, WorldCom and the banks put together this largest corporate bond

4  issuance in U.S. history. On 5/9/01, they sold about $12 billion worth of WorldCom Bonds. The

5  banks pocketed $70 million of the proceeds in underwriting fees. WorldCom took the proceeds and

6  used approximately $10 billion to pay off its commercial paper and other short-term debt, leaving it

7  with $2 billion in cash and giving it ongoing access to the commercial paper market for continued

8  borrowing. There was no draw-down on WorldCom's commercial paper back-up facility with its

9  banks.

10     92.    The banks which acted as the lead underwriters for the 5/01 bond issuance were J.P.

11 Morgan, CitiGroup, Bank America, Deutsche Bank and ABN/AMRO. The data below shows the

12 bonds sold in the 5/01 offering and the monies received by WorldCom and the banks (approximately

13 $11.8 billion):

|  | Public Offering Price | Underwriting Fees | Proceeds to WorldCom (before expenses) |
|---|---|---|---|
| U.S. dollar 6.50% notes due 2004 | $1,497,345,000 | $3,750,000 | $1,493,595,000 |
| U.S. dollar 7.50% notes due 2011 | $3,956,160,000 | $18,000,000 | $3,938,160,000 |
| U.S. dollar 8.25% notes due 2031 | $4,512,508,000 | $40,250,000 | $4,472,258,000 |
| Totals – U.S. dollar notes | $9,966,013,000 | $62,000,000 | $9,904,013,000 |
| Euro 6.75% notes due 2008 | €1,248,987,500 | €5,000,000 | €1,243,987,500 |
| Sterling 7.25% notes due 2008 | £498,850,000 | £2,000,000 | £496,850,000 |

22     93.    By late 00, WorldCom, WorldCom's top insiders, J.P. Morgan, CitiGroup, Bank

23 America, ABN/AMRO, Deutsche Bank, Utendahl and Andersen were planning the 5/01 offering.

24 As part of the process of preparing the 5/01 Registration Statement, these Underwriter Defendants

25 purportedly conducted an adequate and reasonable investigation into the business and operations of

26 WorldCom, an undertaking known as a "due diligence" investigation, but in fact, did not do so.

During the course of their "due diligence," the banks had continual access to confidential corporate

1    information concerning WorldCom's business, financial condition, internal controls and its future
2    business plans and prospects and learned of or should have learned of the falsification of
3    WorldCom's financial condition and results and the other false and misleading statements in the 5/01
4    Registration Statement. Also, as a result of their status as standby lenders for WorldCom on the
5    commercial paper back-up facilities, the banks had access to WorldCom's true financial condition,
6    and knew or should have known it was much worse than publicly presented, which is why the banks
7    wanted to avoid having WorldCom draw down on those credit facilities.

8        94.    In addition to availing themselves of virtually unbridled access to WorldCom's
9    internal corporate information, the banks met with WorldCom's management and top executives and
10   Andersen, and engaged in "drafting sessions" prior to completing the 5/01 Registration Statement.
11   During these sessions, consensus was reached as to: (i) the strategy to best accomplish the 5/01
12   offering; (ii) the terms of the 5/01 offering, including the price at which WorldCom Bonds would be
13   sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about
14   WorldCom would be made in the Registration Statement; and (v) what responses would be made to
15   the SEC in connection with its review of the Registration Statement.

16       95.    In connection with the 5/01 offering, WorldCom filed a Registration Statement with
17   the SEC which became effective on 5/9/01. That Registration Statement contained materially false
18   statements and material omissions, and included WorldCom's false financial statements for the year
19   ended 12/31/00 and the 1stQ 01. These financial statements artificially inflated WorldCom's assets,
20   net income, EPS and cash flows from operations – and associated financial ratios, including its ratio
21   of earnings to fixed charges. WorldCom artificially inflated its revenues and earnings by improperly
22   booking sales, improperly capitalizing ordinary operating costs, failing to write down assets
23   (goodwill) due to the impaired value of earlier acquisitions, improperly re-classifying assets of
24   companies it acquired to lengthen their amortization periods, taking excessive "one-time" acquisition
25   charges that it later secretly used to boost its "operating" earnings, failing to timely record refunds
26   due customers and improperly accounting for receivables it could not collect.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 31 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

96.     However, the planned bond offering was one of the largest in history and included billions of dollars of bonds not due until 2011 and 2031. Because these bonds would be sold for the most part to sophisticated institutional investors, it was necessary for such a bond offering for WorldCom to appear to have sufficiently large assets and earnings power to be able to pay the huge interest payments that would be due on these bonds, and that WorldCom's assets and earnings power were sufficient to retire the bonds when they became due. Maintaining WorldCom's investment-grade credit rating was absolutely indispensable to successfully completing the bond offering. Thus, WorldCom's financial position and results at 12/31/00 and 3/31/01 as presented in the 5/01 Registration Statement appeared to be very strong and consistent with its investment-grade credit rating, as set forth below:

|  | Year Ended 12/31/00 | Quarter Ended 3/31/01 |
|---|---|---|
| Total assets | $98.9 billion | $99.5 billion |
| Revenue | $39.0 billion | $ 9.7 billion |
| Operating income | $ 8.1 billion | $ 1.4 billion |
| Diluted EPS | $1.43 | $0.25 |
| Ratio earnings/ Fixed charges | 5.25:1 | n/a |

97.     In addition to these favorable financial results, the 5/01 Registration Statement also presented other favorable aspects of WorldCom's business:

- WorldCom's 1stQ 01 results were an "excellent start," showing that WorldCom "is on track to deliver strong growth and solid performance throughout the year."

- WorldCom Group had "achieved [its] growth targets" and had "strong" 1stQ 01 results.

- The MCI Group "made excellent progress adjusting ... business to maximize and maintain profitability and cash flow as far into the future as possible."

- WorldCom was "well positioned to capitalize on growth opportunities."

- "The businesses attributed to the MCI group have significant assets."

- The breadth and scale of its services "differentiate [WorldCom's] offerings from those of [its] competitors."

- "We believe our sales and marketing capabilities are one of our strongest competitive advantages."

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 32 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

- Total revenues in 00 increased from 99 due to "internal growth of the WorldCom Group."

- WorldCom was positioned to use its "global assets and ... customer base" to lead a new generation of fast growing e-commerce and data driven markets.

98. The 5/01 Registration Statement was also materially false and misleading because it failed to disclose material facts regarding WorldCom's $6 billion acquisition of Intermedia, including the material facts that WorldCom had done no due diligence prior to agreeing to the transaction, as described herein.

99. After the Intermedia acquisition announcement, minority shareholders of Intermedia filed a lawsuit challenging the transaction. This litigation, and the declining value of Intermedia's assets, gave WorldCom an opportunity to abandon the transaction. Rather than do so, WorldCom management, without consulting the Board, amended the merger agreement in 2/01.

100. In fact, on 2/15/01, WorldCom had issued a press release entitled "WorldCom, Intermedia and Digex Agree to Settle Lawsuit Related to WorldCom-Intermedia Merger," which falsely asserted the proposed settlement had been approved by WorldCom's Board of Directors. It also quoted Ebbers:

> "We are pleased to put this matter to rest and look forward to enhancing our ability to provide world-class managed web and application hosting services," said Bernard J. Ebbers, WorldCom president and chief executive officer. "This agreement helps WorldCom accelerate momentum in its global managed hosting business and is ideally complementary to WorldCom's range of data, Internet, VPN, and managed networks."

101. The Registration Statement for the 5/01 offering discussed WorldCom's business and finances. The Registration Statement incorporated WorldCom's Form 10-K for the year ended 12/31/00, and the Forms 8-K filed 4/26/01 and 5/1/01. WorldCom's 00 Form 10-K contained its audited financial results for 99 and 00. The 4/26/01 Form 8-K included the press release announcing WorldCom's financial results for the quarter ending 3/31/01.

102. WorldCom's 4/26/01 Form 8-K, which was incorporated by reference into the Registration Statement, stated:

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 33 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

***WORLDCOM GROUP FIRST QUARTER 2001 REVENUES UP 12 PERCENT, ACHIEVING GROWTH TARGETS AND DELIVERING SOLID RESULTS.***

***WORLDCOM, INC. REPORTS FIRST QUARTER CASH EPS OF 35 CENTS.***

... WorldCom, Inc., the leading global digital and data communications provider, today announced financial results for the quarter ended March 31, 2001,

\*    \*    \*

WORLDCOM GROUP RESULTS

WorldCom group, which includes the Company's high-growth data, Internet and international operations, as well as commercial voice services, reported revenues of $6.1 billion, a 12 percent increase from the same period in 2000. This ***strong result*** was driven by 22 percent year-over-year revenue growth in data and Internet services and 19 percent revenue growth in international services.

Data and Internet services accounted for $2.8 billion or 45 percent of WorldCom group's revenues, up from 42 percent in the first quarter of 2000. ***Revenue growth in these fast-growing services continues to lead the industry ....***

\*    \*    \*

WorldCom group reported cash earnings (earnings before goodwill amortization) of $865 million or 30 cents per share. WorldCom group net income, after goodwill amortization, was $638 million or 22 cents per share in the quarter.

MCI GROUP RESULTS

MCI group, the Company's consumer, small business, wholesale long distance, wireless messaging and dial-up Internet access businesses, reported revenues of $3.6 billion, versus $4.2 billion in the same period last year. ***Contrary to industry trends, MCI group consumer subscription long distance and local services reported revenue growth.***

\*    \*    \*

CONSOLIDATED WORLDCOM, INC. RESULTS

First quarter 2001 consolidated revenues were $9.7 billion, up from $9.6 billion in the same period of 2000. Consolidated EBITDA was $2.9 billion, representing an EBITDA margin of 30 percent.

First quarter 2001 cash earnings were $1.0 billion, or 35 cents per share. Consolidated net income, after goodwill amortization, was $729 million or 25 cents per share in the quarter.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 34 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

MANAGEMENT'S COMMENTS

"*This quarter was an excellent start to what will be a pivotal year for WorldCom. These results show that WorldCom is on track to deliver strong growth and solid performance throughout the year*," said Bernard J. Ebbers, president and CEO of WorldCom, Inc.

"*On the WorldCom group side we achieved our growth targets, adding $237 million in revenues since the fourth quarter – the largest sequential increase we've delivered in a year.*"

"*And on the MCI group side we made excellent progress adjusting our businesses to maximize and maintain profitability and cash flow as far into the future as possible.*"

The Company continues to expect full-year 2001 WorldCom group revenue growth of between 12 and 15 percent and expects WorldCom group cash earnings of between $1.25 and $1.35 per share for the year.

103.    With respect to the Company's recent results, the Registration Statement stated:

### Recent Developments

The following information reflects selected results for the quarter ended March 31, 2001 for the WorldCom group, the MCI group and WorldCom as a whole.

WorldCom **group** reported first quarter 2001 revenues of $6.1 billion, a 12 percent increase from the same period in 2000. This *strong result* was driven by 22 percent year-over-year revenue growth in data and Internet services and 19 percent revenue growth in international services.

\*       \*       \*

### Selected Historical Financial Data

\*       \*       \*

In reading the following selected financial data, please note the following:

\*       \*       \*

–       Results for 2000 include ... a $685 million pre-tax charge associated with specific domestic and international wholesale accounts that were no longer deemed collectible due to bankruptcies, litigation and settlements of contractual disputes that occurred in the third quarter of 2000.

\*       \*       \*

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

\- 35 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 · Fax: 206/749-9978

| | AT OR FOR THE YEAR ENDED DECEMBER 31, | |
| --- | --- | --- |
| | 1999 | 2000 |
| | (IN MILLIONS, EXCEPT PER SHARE DATA) | |
| OPERATING RESULTS: | | |
| Revenues | $35,908 | $39,090 |
| Operating income (loss) ... | 7,888 | 8,153 |
| EARNINGS (LOSS) PER COMMON SHARE: | | |
| Net Income (Loss) – | | |
| Basic | 1.40 | 1.43 |
| Diluted | 1.35 | 1.40 |
| FINANCIAL POSITION: | | |
| Total assets | $91,072 | $98,903 |
| Shareholders' investment | 51,238 | 55,409 |
| Ratio of earnings to fixed charges | 5.75:1 | 5.25:1 |

104.    Furthermore, WorldCom's 00 Form 10-K, which was incorporated by reference in the

Registration Statement, contained the following statements regarding WorldCom's business:

> *We believe we are positioned to use those global assets and our customer base to lead the new generation of fast growing, e-commerce and data-driven segments of the communications industry.*

\*     \*     \*

> Using our Internet protocol infrastructure, we intend to continue our expansion into high growth, next generation services, such as virtual private networks which use Internet protocol technology, web centers that allow customers to interact with sales and service agents over the Internet, the telephone or mail, and Internet content delivery services.  *We believe the breadth and scale of these services differentiate our offerings from those of our competitors and meet our customers' increasingly complex communications needs, highlighting the unique quality and reach of our networks.*

> *We are positioning the company for leadership in the high growth segments of our industry.  Our proposed merger with Intermedia Communications and resulting controlling interest in Digex will provide us with a strong foothold in the expanding managed hosting arena.*

\*     \*     \*

> Domestic connections using Internet protocol technology are expected to grow at an annual rate of approximately 27% from $13.5 billion in 1998 to approximately $46.3 billion by 2003, according to market studies by Probe Research.  Much of the growth is expected to result from increased demand for e-mail, web hosting services, e-commerce, collaborative workflow and real-time video services and applications.  We believe that most of the growth in data communications will be driven by corporations' demand for high quality and scalable Internet-based infrastructure and services, including web hosting and other managed network services.  *We are well positioned to capitalize on these growth opportunities and to shape the future of global digital communications due to our network, global customer base, tradition*

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 36 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1    *of innovation and corporate strategy to target and lead the high end of data-driven*
     *emerging communications segments.*

2
                                    *       *       *
3

4            Our management's mandate is to use our existing market positions and assets
     opportunistically to optimize cash flow, while retiring the debt attributed to the MCI
     group. Available cash flow, after debt and interest repayments, will be available for
5    dividend payments and possible share repurchases. *The businesses attributed to the*
     *MCI group have significant assets*, including the nationally recognized brand,
6    extensive customer relationships, 20 call centers with highly effective sales
     representatives and a tradition of developing innovative calling plans that enhance
7    customer retention. *Management believes it can leverage these strengths to deliver*
     *new services and to bundle existing services.*

8
                                    *       *       *
9

10           *We believe our sales and marketing capabilities are one of our strongest*
     *competitive advantages.* Telemarketing is a fundamental component of the sales
11   effort for residential and small business customers. Typically, roughly 50% of our
     residential and small business installations are sold through some 8,500 telemarketers
12   based in 20 call centers nationwide. Our marketing partners, in turn, are a key
     competitive advantage for differentiating long distance sales, offering consumers the
13   opportunity to earn frequent flyer miles, free video rentals, and similar awards based
     on long distance usage. Over 50% of subscription long distance minutes are
14   generated by our 7.5 million partner customers.

15                                  *       *       *

16           *REVENUES. Revenues for 2000 increased 15.3% to $22.8 billion versus*
     *$19.7 billion for the same period in the prior year. The increase in total revenues*
17   *is attributable to internal growth of the WorldCom group.*

18           105.    Based on WorldCom's apparent huge asset base and strong historical earnings, the

19   WorldCom Bonds as presented in the 5/01 Registration Statement filed with the SEC to sell these

20   "investment-grade" bonds appeared to be a very safe investment. The Registration Statement

21   contained no risk factors with respect to investment in the WorldCom Bonds. The Registration

     Statement presented WorldCom as having over $99 billion in assets, as being very profitable and as
22
     having an "earnings-to-fixed-charges ratio" – the key financial measure of the safety of a debt
23
     issuance – of 5.25 to 1, a very strong ratio.
24

25           106.    The 5/01 Registration Statement was false or misleading, as set forth below. Any

26   forward-looking statements included or incorporated in the Registration Statement/Prospectus are

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 37 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1  not protected by the "safe harbor" since this was the first time these bonds had been offered to the

2  public as described in ¶227.

3      107.    The banks received the following amounts of the underwriting fees for their

4  participation in the offering:

5              CitiGroup          $19.9 million

6              ABN AMRO           $ 5.0 million

7              Bank America       $ 6.8 million

8              J.P. Morgan        $19.9 million

9              Deutsche Bank      $ 5.0 million

10

## The Truth Begins to Be Revealed

11      108.    On 6/25/02, WorldCom admitted it had engaged in one of the largest financial

12  falsifications in history – overstating its earnings and operating cash flow by billions of dollars in 01

13  and the 1stQ 02 by improperly capitalizing normal operating expenses.   WorldCom has now

14  admitted that its 1stQ 01 financial results incorporated in the 5/01 Registration Statement were

15  materially false and that it improperly disguised ordinary operating expenses as capital assets in the

16  amount of $771 million in the 1stQ 01. This practice not only inflated earnings but inflated the cash

17  flows WorldCom reported from operations. WorldCom reported operating income of $1.281 billion

18  and cash flows from operations of $1.596 billion in the 1stQ 01. Thus, by 6/02, WorldCom had

19  admitted that the falsification of its 1stQ 01 results overstated its operating income by at least 60%

20  and its cash flows from operations by at least 48%! This revelation resulted in the ouster of

21  WorldCom's CFO and its controller. The WorldCom Bonds now collapsed, to just $0.12-$0.20 on

22  the dollar. WorldCom common stock dropped to just pennies per share.   The SEC publicly

23  condemned this financial manipulation and sued WorldCom for fraud, stating that WorldCom had

24  "falsely portrayed itself as a profitable business." President Bush condemned these "outrageous"

25  and "egregious practices."

26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933                                    - 38 -

109.   WorldCom's admission that its huge $3.8 billion expense concealment falsification began in the 1stQ 01, *i.e.*, right when the huge WorldCom bond offering was being put together, is of enormous significance.   The Registration Statement by which the bonds were sold not only contained WorldCom's false 99 and 00 annual financial statements, certified by Andersen, but also incorporated WorldCom's 1stQ 01 results which showed operating profits of $1.4 billion, EPS of $0.25 and cash flow from operations of $1.6 billion.  Thus, WorldCom has admitted that these financial results were materially false.

110.   On 6/28/02, the *Financial Times* reported:

BOND ISSUANCE PRIDE CAME BEFORE A FALL

> For an idea of the scale of the demise of WorldCom, look no further than May 2001, when the company raised $11.9bn in the capital markets and gained bragging rights – for the second time – to being the issuer of one of the market's biggest ever transactions.
>
> WorldCom had credit ratings at the time of BBB+ from Standard & Poor's and A3 from Moody's Investors Service.
>
> These levels are in the bottom half of investment grade range of creditworthiness ratings, but are still comfortably within that range.
>
> The fact that WorldCom was so rated by Moody's and S&P was undoubtedly a factor in attracting strong investor interest to its enormous bond issue, which included tranches in euros and sterling as well as a mammoth US dollar issue.

*       *       *

> The scale of WorldCom's slide down the creditworthiness scale has angered some investors.

*       *       *

> [C]riticism has come from Sean Egan, a founder of Egan-Jones Ratings, an independent credit-rating firm ....

*       *       *

> Egan said: "WorldCom should not have been able to raise $11.9bn last year and would not have been [able to raise this money] if its credit rating had been where it should have been."

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 39 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

111.   According to *The Wall Street Journal*:

INSIDE WORLDCOM'S UNEARTHING OF A VAST ACCOUNTING
SCANDAL

\*      \*      \*

     Mr. Sullivan never attempted to cover up the aggressive accounting method,
the person familiar with the matter says. Details are spelled out clearly enough in
internal company documents, this person says, that "other people had to see it unless
they were blind."

112.   At the time of the Offerings, WorldCom's finances were collapsing. In fact, the
Company was losing money, not achieving profits. Its assets and net worth were overstated by
billions of dollars. And its liquidity was impaired. WorldCom had borrowed about all it could in the
commercial paper market and its banks were reluctant to lend it money – pushing it instead to do the
Offerings to raise billions of dollars of long-term debt from public investors. The fact that the
WorldCom 5/01 offering was necessary to prevent a financial collapse of WorldCom is confirmed
by the admission of John W. Sidgmore, Ebbers' successor, at WorldCom's 02 Annual Meeting of
Shareholders on 6/13/02. There he said that WorldCom had $8 billion dollars of short-term debt in
early 01 prior to the bond offering, but "if we had commercial paper six months ago, we would be
flat-out out of business and Scott [Sullivan, WorldCom's CFO] and his team negotiated all those
away.... [F]rankly Scott has done a fantastic job of shoring up our balance sheet and that is the only
reason this company has a chance when a lot of the other ones are going under."

113.   In 7/02, information surfaced indicating that WorldCom's 99 and 00 financial results
had been falsified as well by the use of drawing down upon excess reserves created in connection
with earlier acquisitions during 98-99. WorldCom's common stock plunged to pennies a share, and
in 7/02, WorldCom went bankrupt. Thus, investors who purchased "investment-grade" rated
WorldCom Bonds in 5/00 and 5/01 from a company with an apparently huge asset base, strong
earning power and billions in positive cash flow have now suffered losses of billions of dollars and
hold "junk" bonds in a company that never made a true profit, is bankrupt and these bonds are in
default. The WorldCom Bonds collapsed upon the negative company-specific revelations and

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 40 -

1  bankruptcy in 7/02, losing some 90% of their value. Likewise, WorldCom's common stock dropped

2  to pennies per share due to this adverse news and WorldCom's bankruptcy.

3      114.   On 7/31/02, WorldCom's former CFO (defendant Sullivan) and controller (Myers)

4  were indicted and arrested for securities fraud in connection with their falsification of WorldCom's

5  financial results. The complaint against Sullivan and Myers states in part:

> [T]he chart set forth below fairly summarizes the quarterly transfers from certain
> current expense line cost accounts to certain PP&E capital expenditure accounts
> between April 2001 and April 2002. Figures expressed in the chart are rounded to
> the nearest million.

WorldCom General Ledger Account Adjustments
(expressed in millions)

| | Income Statements Line Cost Expense Accounts | | | | | | | Balance Sheet Asset Accounts | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Inter-state Origin-ting | Special Access Summ-ary | Special Access Local | Total Credits | Other Access-Non Current | Trans-mission Equip-ment | Commu-nications Equip-ment | Furni-ture, Fixtures & Other | Const-ruction in Progress | Total Debits |
| Q1-2001 | $ 671 | $ 100 | | $ 771 | $ 629 | | | | $ 142 | $ 771 |
| Q2-2001 | $ 480 | $ 80 | | $ 560 | | | | | $ 560 | $ 560 |
| Q3-2001 | $ 578 | $ 90 | $ 75 | $ 743 | | $ 343 | $ 400 | | | $ 743 |
| Q4-2001 | $ 539 | $ 317 | $ 85 | $ 941 | | $ 539 | $ 317 | $ 85 | | $ 941 |
| Q1-2002 | $ 575 | $ 153 | $ 80 | $ 818 | | $ 818 | | | | $ 818 |
| GRAND TOTALS | | | | $3,833 | | | | | | $3,833 |

115.   Then, on 9/19/02, it was revealed that WorldCom had misaccounted for an additional

$2 billion in earnings, due in part to the Company's improper accounting for its interest in Embratel,

which it acquired in 98. This misaccounting added hundreds of millions of dollars to WorldCom's

reported earnings.

116.   Later, on 9/26/02, WorldCom's former controller pled guilty to securities violations,

indicating he had been instructed on a quarterly basis by senior management to falsify WorldCom's

financial statements.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 41 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

117.   On 10/14/02, *The Wall Street Journal* reported:

A closely held company controlled by WorldCom Inc.'s former chief executive, Bernard Ebbers, received $679 million in loans from the Travelers Insurance subsidiary of Citigroup Inc., adding to the potential conflicts of interest faced by Citigroup in its dealings with WorldCom, a lawsuit alleges.

The lawsuit portrays an even deeper financial relationship than previously disclosed between Citigroup and Mr. Ebbers. The former telecom executive also made personal profits from large stock allocations in hot initial public offerings underwritten by Citigroup's Salomon Smith Barney investment-banking unit. And Salomon earned tens of millions of dollars in fees as an underwriter for WorldCom's stock and bond offering.

\*     \*     \*

Citing interviews with an unidentified former senior broker at Salomon, the suit claims that Mr. Grubman and others at Salomon helped Mr. Ebbers obtain $499 million in loans from Travelers in September 1999 for one of his personal holding companies, Joshua Timberlands LLC of Brookhaven, Miss.

\*     \*     \*

Citing public records filed in Mississippi, the complaint also claims that Travelers entered into an additional $180 million loan agreement with Joshua Timberlands in February 2000, bringing the total amount of Ebbers-related loans from Travelers to $679 million.

\*     \*     \*

The complaint suggests – though it doesn't cite definitive evidence – that the loans from Travelers "apparently" were secured not by the real estate that Mr. Ebbers purchased, but by Mr. Ebbers's personal holdings in WorldCom stock. In making that suggestion, attorneys for the New York retirement fund appear to be piecing together details from several different public records on file with state agencies in Mississippi. The complaint states that those records appear to show that Travelers and Mr. Ebbers's holding company began changing the terms of the mortgage loans so that the collateral originally pledged for the loans no longer would be fully pledged. The complaint also cites an August article in the Birmingham News of Alabama, which reported that Mr. Ebbers pledged his WorldCom shares to obtain the loans that Joshua Timberlands used to buy the acreage; the article didn't identify the lender.

118.   On 11/4/02, the Bankruptcy Examiner's initial report was released indicating additional problems. As *Reuters* reported:

An examiner in the WorldCom Inc. bankruptcy case suggested the telephone and data services company took "extraordinary and illegal steps" to manipulate its financial records, and predicted it would have to restate results beyond the $7.68 billion already disclosed.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 42 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

"A picture is clearly emerging of a company that had a number of troubling and serious issues," Dick Thornburgh, the examiner appointed by the U.S. Trustee, said in a 118-page report filed with the bankruptcy court.

"These issues relate to the culture, internal controls, management, integrity, disclosures and financial statements of the company," he said.

\*     \*     \*

"Our investigation strongly suggests that WorldCom personnel responded to changing business conditions and earnings pressure by taking extraordinary and illegal steps to mask the discrepancy between the financial reality at the company and Wall Street's expectations," Thornburgh said.

The report highlighted the influence former WorldCom Chief Executive Bernard Ebbers had over the company and its board of directors. Ebbers' lawyer has said the investigations will uncover "not a shred of credible evidence that Bernie Ebbers had a thing to do with those (accounting) decisions."

\*     \*     \*

The examiner reviewed more than a million WorldCom documents. Thornburgh said he will continue to probe several areas, including WorldCom's relationship with investment bank Salomon Smith Barney, the accounting for WorldCom's Latin American investments Embratel and Avantel, and decisions made by the board's audit and compensation committees.

The report indicates that the flow of bad news from the company hasn't stopped. This could foreshadow additional lawsuits brought against the company and make it difficult for it to emerge from Chapter 11 bankruptcy protection, bankruptcy experts said.

\*     \*     \*

Thornburgh offered damning observations about a company where the CEO "exercised substantial influence over the board's decision-making process and actions" and where "critical questioning was discouraged."

The board's compensation and stock option committee "seems to largely abdicate its responsibilities to Mr. Ebbers. It approved compensation packages that appear overly generous and disproportionate."

From Jan. 1, 1999, to Dec. 31, 2001, Ebbers received more than $77 million in cash and benefits, while shareholders lost in excess of $140 billion in value, the report noted.

The report also raised questions about the "unusually close and potentially problematic" relationship between WorldCom and its investment banker Salomon Smith Barney, and Jack Grubman, an influential telecommunications analyst at that firm.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

- 43 -

119.   On 11/5/02, the SEC filed an amended complaint against WorldCom in the federal district court in New York with WorldCom's consent, adding claims that WorldCom violated the antifraud provision of the Securities Act.  The amended complaint broadened the Commission's charges to allege that WorldCom misled investors from at least as early as 99 through the 1stQ 02, and further states that the Company has acknowledged that during that period, as a result of undisclosed and improper accounting, WorldCom materially overstated the income it reported on its financial statements by approximately $9 billion.  On 11/26/02, the SEC announced that a judgment of permanent injunction was entered in its pending civil enforcement action against WorldCom:

> The judgment, signed by U.S. District Judge Jed S. Rakoff of the Southern District of New York:  (1) imposes the full injunctive relief sought by the Commission, (2) orders an extensive review of the company's corporate governance systems, policies, plans, and practices, (3) orders an extensive review of the company's internal accounting control structure and policies, (4) orders that WorldCom provide reasonable training and education to certain officers and employees to minimize the possibility of future violations of the federal securities laws, and (5) provides that civil money penalties, if any, will be decided by the Court at a later date.

120.   In late 3/03, news reports indicated that the size of the accounting misstatements was even higher than previous reports, approximately $11 billion.

121.   On 6/9/03, the Bankruptcy Examiner issued his second interim report in which he concluded:

> A culture and internal processes that discourage or implicitly forbid scrutiny and detailed questioning can be a breeding ground for fraudulent misdeeds.  It also can beget ill-considered and wasteful acquisitions, improperly managed and unchecked debt and poor credit management, a lack of due diligence regarding personal loans made by the Company to its Chief Executive Officer, sales of Company stock by the Chief Executive Officer that contravene WorldCom policy and possibly the federal securities laws, and an effective neutering of other gatekeepers, such as the lawyers, Internal Audit Department and the Company's outside auditors.  In tandem with the accounting irregularities, these developments fostered the illusion that WorldCom was more healthy and successful than it actually was throughout most of the relevant period.  Ultimately, they also produced the largest bankruptcy in the history of the United States.

122.   On that same day, the Special Investigative Committee of the Board of Directors of WorldCom issued its Report of Investigation in which it concluded:

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933                                            - 44 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

From 1999 until 2002, WorldCom suffered one of the largest public company accounting frauds in history. As enormous as the fraud was, it was accomplished in a relatively mundane way: more than $98 billion in false or unsupported accounting entries were made in WorldCom's financial systems in order to achieve desired reported financial results. The fraud did not involve WorldCom's network, its technology, or its engineering. Most of WorldCom's people did not know it was occurring. Rather, the fraud occurred as a result of knowing misconduct directed by a few senior executives centered in its Clinton, Mississippi headquarters, and implemented by personnel in its financial and accounting departments in several locations. The fraud was the consequence of the way WorldCom's Chief Executive Officer, Bernard J. Ebbers, ran the Company. Though much of this Report details the implementation of the fraud by others, he was the source of the culture, as well as much of the pressure, that gave birth to this fraud. That the fraud continued as long as it did was due to a lack of courage to blow the whistle on the part of others in WorldCom's financial and accounting departments; inadequate audits by Arthur Andersen; and a financial system whose controls were sorely deficient. The setting in which it occurred was marked by a serious corporate governance failure.

123.    On 3/12/04, WorldCom filed its 02 Form 10-K which included a restatement of WorldCom's 00 and 01 financial statements. The restatement admitted to various financial misstatements totaling billions of dollars:

- Goodwill Impairment: "As part of the restatement process, the Company identified conditions at various dates which indicated that the carrying values of goodwill and long-lived assets were impaired. For the periods under review, the Company found no evidence that SFAS 121 impairment analyses had been previously performed even though trigger events were apparent."

- Improper Reduction of Access Costs: "Both the Company's accounting policy and GAAP require that access cost expense be expensed as incurred. Improper capitalization of access costs represented a decrease in access cost expenses of $2.8 billion for the year ended December 31, 2001.... In addition, access cost expenses were decreased through the inappropriate reduction of accrual balances on the balance sheet. These adjustments reduced the accrual balances to levels below those indicated by the Company's estimation policies and historical experience. Additionally, other balance sheet accruals, unrelated to access cost expenses, were reduced to offset access cost expenses. Improper reduction of accrual balances resulting in the reduction of access costs represented a decrease in access cost expenses of $144 million and $1.8 billion for the years ended December 31, 2001 and 2002, respectively."

- Purchase Accounting: "Between 1993 and 2001, the Company acquired numerous telecommunication service providers offering complementary or similar services to those of the Company. As part of the restatement process, all significant acquisition transactions, including the MCI Communications Corporation ("MCI") and Intermedia (see Note 9) acquisitions were reviewed and the fair value allocations and purchase price calculations were re-performed. As a result of this process, errors were found in the application of purchase accounting in connection with many of the acquisitions accounted for as purchases.... Additionally, amounts allocated to in-process research and development ("IPR&D") acquired as part of the purchases of

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 45 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

MCI, ANS/Compuserve and MFS Communications were reversed due to improper inclusion of research and development projects that failed to qualify under GAAP and incomplete information from which to measure the applicable amounts. The result was the reversal of expenses to write off such IPR&D assets in the acquisition periods. The reduction in the allocations of the IPR&D assets resulted in an increase in goodwill. Although the effect of the expense reversal did not impact pre-tax income for the periods being presented since the related acquisitions occurred prior to 2000, the increase to goodwill resulted in increased amortization expense for the years ended December 31, 2001 and 2000.... The misapplication of the purchase accounting guidance resulted in the improper establishment of liabilities. Adjustments were required to reverse the improperly established liabilities and the impact of those items on goodwill and operating expenses during the post-acquisition periods. The primary impact on pre-tax income from purchase accounting adjustments resulted from an increase to depreciation and amortization expense of $1.5 billion and $3.0 billion for the years ended December 31, 2001 and 2000, respectively. The remaining impact was largely due to the reversal of improperly established and utilized liabilities."

- Revenue Adjustments: "Prior to January 1, 2000, the Company's policy was to capitalize and defer customer activation, installation and provisioning costs over a five-year period. In 2000, in conjunction with the adoption of the previsions of SAB 101, the Company began amortizing these costs consistent with the customer contract life. It was determined as a part of the restatement process that, although the Company's policy had been to defer such costs, the Company did not properly apply this policy as the requisite criteria for deferral were not met and sufficient records to support the amounts deferred were not maintained. As a result, the Company eliminated the deferred cost balances and restated its consolidated statements of operations to recognize such costs in the period incurred."

- Accounts Receivable: "The Company determined that allowances for doubtful accounts reserves had not been established in accordance with GAAP, allowance methodologies were not applied consistently and revenue adjustments were needed to correct the balances in accounts receivable. As a result, the Company reduced revenue and increased its previously reported allowance for doubtful accounts as of and for the years ended December 31, 2001 and 2000. The adjustments to the allowance for doubtful accounts increased selling, general and administrative expenses in the consolidated statements of operations."

- Improper Classification of Liabilities: "During the restatement process, the Company determined that certain accrued liability accounts were incorrectly transferred to various line items in the consolidated statements of operations without any justification or supporting documentation. The Company has been able to determine the periods, amounts and line items that were improperly reflected in its previously filed consolidated statements of operations and has reversed those amounts in its consolidated financial statements. However, due to a lack of adequate documentation, the Company has been unable to determine the appropriate statement of operations line item where an offsetting entry should have been applied. The Company has determined that such correcting entries should be aggregated and reflected as 'Unclassified income/(expense)' in the applicable period. In addition to the activities in the accrual accounts, the Company's investigation identified other assets and liabilities that were recorded on its historical balance sheet, but for which there is inadequate support to establish the existence of such assets or liabilities.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 46 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

With respect to these amounts, the Company concluded that they do not represent assets or liabilities and has instead charged them to its consolidated statements of operations."

• Other: WorldCom also restated its results to reflect improper classifications for expenses, improper consolidation or non-consolidation of subsidiaries, improper use of foreign currency translation, and other items.

124.    The impact of WorldCom's restatement was dramatic:

|  | 2000 | | 2001 | |
|---|---|---|---|---|
|  | As Reported | As Restated | As Reported | As Restated |
| Pre-Tax Income (Loss) | $7.58 B | ($58.00 B) | $2.38 B | ($17.50 B) |
| Current Assets | $9.66 B | $9.15 B | $9.10 B | $8.37 B |
| Property, Plant & Equipment | $40.94 B | $24.48 B | $42.67 B | $21.49 B |
| Goodwill & Other Intangibles | $42.99 B | $5.82 B | $46.58 B | $2.28 B |
| Other Assets | $5.13 B | $4.74 B | $5.36 B | $1.57 B |
| Current Liabilities | $17.58 B | $19.14 B | $9.13 B | $13.39 B |
| Shareholders Equity (Deficit) | $55.35 B | $1.79 B | $57.86 B | ($12.94 B) |
| Cash Flows from Operations | $7.67 B | $4.23 B | $7.99 B | $2.85 B |

125.    The value of WorldCom Bonds have collapsed. The plan for reorganization proposes that bondholders in the 5/00 and 5/01 offerings receive only a small portion of their losses.

## WORLDCOM'S FALSE FINANCIAL STATEMENTS
## INCLUDED IN THE OFFERING DOCUMENTS

126.    WorldCom's reported financial statements included, or incorporated by reference, in the 5/00 and 5/01 Registration Statements were falsified in several ways:

    (a)    improperly capitalizing line costs;

    (b)    improperly using accrual accounts to understate line costs and other expenses and manipulating WorldCom's tax rates to inflate earnings;

    (c)    recording excess charges for acquisitions and then reversing the charges into income in subsequent quarters to report the desired growth;

    (d)    improperly recording revenue through unsupported journal entries;

    (e)    failing to record impairment for goodwill as required by GAAP;

    (f)    failing to record a loss for uncollectible receivables; and

    (g)    improperly capitalizing software development costs.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 47 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

127.    It is undeniable that WorldCom's financial statements were materially misstated. The Company has admitted to the largest restatement of financial results ever over a period of years and in numerous ways. The Company has also recorded goodwill write-offs in excess of $45 billion. The breadth and enormity of WorldCom's accounting manipulations were made possible due to the Company's inadequate internal controls, its rapid acquisitions, its domination by a single individual – Bernard Ebbers – its weak audit committee, the inadequate audits by Andersen and its cozy relationship with the banks, including CitiGroup. In fact, financial statement manipulation was a way of life at WorldCom. As Ebbers told an employee, "We won't have to worry about earnings-per-share growth for years, with all our acquisitions," alluding to WorldCom's long-standing practice of manipulating reported results through taking excessive "one-time" charges in connection with acquisitions and later on reducing or drawing down on these charges to artificially boost subsequently reported operating earnings. These excessive charges began in the mid-90s and were used to inflate later results. It has recently been disclosed that WorldCom's misstatements approximate $11 billion. On 9/26/02, Myers, the former controller of WorldCom, pleaded guilty to securities fraud charges admitting he was instructed to falsify records in what became the largest corporate accounting scandal in U.S. history. "I was instructed on a quarterly basis by senior management to ensure that entries were made to falsify WorldCom's books to reduce WorldCom's reported actual costs and therefore to increase WorldCom's reported earnings," Myers told Judge Richard Casey.

128.    The accounting misstatements were enormous. As the Special Investigative Committee of the Board of Directors of WorldCom noted in their 6/9/03 report:

**SUMMARY OF IMPROPER INCOME STATEMENT AMOUNTS BY AREA**
*(millions of dollars)*

| Financial Statements Area | 1999 | 2000 | 2001 | 2002 | TOTAL |
|---|---|---|---|---|---|
| Revenue | 205 | 328 | 358 | 67 | 958 |
| Line Costs | 598 | 2,870 | 3,063 | 798 | 7,329 |
| SG&A | 46 | 283 | 181 | 25 | 535 |
| Other | 89 | 393 | (4) | (50) | 428 |
| TOTAL | 938 | 3,874 | 3,598 | 840 | 9,250 |

(Footnotes omitted.)

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 48 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978