129.   The Special Committee's investigation was largely limited to WorldCom's financial statements after 98. The committee interviewed audit committee members for 00-02 and reviewed work papers for 99, 00, and 01.

**The Prospectuses/Registration Statements**
**Reported False Financial Results**

130.   The 5/00 Registration Statement included WorldCom's 1stQ 00 results and incorporated WorldCom's 3/31/00 Form 10-Q which contained WorldCom's financial statements for the 1stQ 00, including:

|  | 3/31/00 |
|---|---|
| Revenues | $ 9.978 billion |
| Operating Income | $ 2.44 billion |
| Net Income | $ 1.284 billion |
| EPS | $ 0.44 |
| Goodwill & Intangibles | $47.169 billion |
| Ratio of Earnings to Fixed Charges | 7.01:1 |

131.   The 5/01 Registration Statement included the following financial results:

|  | Year Ended 12/31/00 | Quarter Ended 3/31/01 |
|---|---|---|
| Revenues | $39 billion | $  9.7 billion |
| Operating Income | $ 8.1 billion | $  1.4 billion |
| Net Income | $ 4 billion | $  729 million |
| EPS | $1.43 | $0.25 |
| Ratio of earnings to fixed charges | 5.25:1 | n/a |

132.   In fact, WorldCom's reported results for 98, 99, 00 and the 1stQ 01 were overstated due to several improper accounting practices and manipulations.

133.   WorldCom's 99-00 financial reports in the 5/00 and 5/01 Registration Statements were supported by the opinion of Andersen, which stated:

> We have audited the accompanying consolidated balance sheets of WorldCom, Inc. (a Georgia corporation) and subsidiaries as of December 31, 1999 and 2000, and the related consolidated statements of operations, shareholders' investment and cash flows for each of the years in the three-year period ended December 31, 2000. These financial statements are the responsibility of the

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 49 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of WorldCom, Inc. and subsidiaries as of December 31, 1999 and 2000, and the results of their operations and cash flows for each of the years in the three-year period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.

Andersen issued a nearly identical letter as to WorldCom's 99 and 98 financial statements. The Andersen opinion letters were false because WorldCom's 99 and 00 financial statements did not fairly present WorldCom's financial results in conformity with GAAP.

134.    WorldCom's 98, 99, 00 and 1stQ 01 results were materially false and misleading. WorldCom's financial results for 98, 99, 1stQ 00, 00 and 1stQ 01 were also not a fair presentation of WorldCom's results, but rather were presented in violation of GAAP, SEC rules and the doctrine of "fair presentation."

135.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 50 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

**Line Costs Manipulations**

136. Beginning at least as early as 99, WorldCom grossly inflated its earnings by manipulating line costs by either transferring billions of dollars of ongoing operating expenses to capital expenditures so that the costs would be considered an asset rather than an expense, or by reducing line costs by applying reserves from other areas to line costs, as described herein.

**WorldCom's Improper Capitalization of Line Costs**

137. WorldCom has admitted that $3.8 billion in line costs that should have been expensed as incurred were in fact capitalized, thereby overstating WorldCom's earnings and its cash flows from operations.

138. GAAP as described by FASB Statement of Concepts ("Concepts") No. 5, ¶85, states that expenses are recognized when benefits are used up in delivering services. Assets are recorded only when there is a probable future economic benefit from a cost. Concepts No. 6, ¶25.

139. WorldCom has now admitted that

it intends to restate its financial statements for 2001 and the first quarter of 2002. As a result of an internal audit of the company's capital expenditure accounting, it was determined that certain transfers from line cost expenses to capital accounts during this period were not made in accordance with generally accepted accounting principles (GAAP). The amount of these transfers was $3.055 billion for 2001 and $797 million for first quarter 2002. Without these transfers, the company's reported EBITDA would be reduced to $6.339 billion for 2001 and $1.368 billion for first quarter 2002, and the company would have reported a net loss for 2001 and for the first quarter of 2002.

140. From 1stQ 01 through 1stQ 02 WorldCom capitalized $3.5 billion of operating line costs in violation of accounting standards. These increases to capitalize the costs were made in large round-dollar amounts at the close of each quarter and increased capitalization, reducing expenses, by the following amounts:

**Reductions to Line Costs by Capitalization and Other Adjustments**
*(millions of dollars)*

|  | 1Q01 | 2Q01 | 3Q01 | 4Q01 | 1Q02 | Total |
|---|---|---|---|---|---|---|
| Capitalization | 544 | 560 | 743 | 841 | 818 | 3,506 |
| Other Adjustments | 227 | 50 | - | 100 | - | 377 |
| Total | 771 | 610 | 743 | 941 | 818 | 3,883 |

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 51 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

The Special Investigative Committee noted that the "line costs that WorldCom capitalized were ongoing, operating expenses that accounting rules required WorldCom to recognize immediately."

141.    The reason for the line cost manipulation was an increasing problem with excess capacity that occurred during 00. Prior to that time, management pushed for revenues no matter what the cost. Prior to mid-00, they were more worried about being caught without sufficient network capacity to handle prospective traffic than they were with the costs of such capacity. This resulted in WorldCom entering into long-term, fixed-rate leases to handle future anticipated customer demand. By mid-00, customer traffic had not grown and WorldCom was not able to contain the costs of all this capacity expansion. The capacity glut increased and competition resulted in reduced prices and revenues. Thus, line costs became one of the most important line items in WorldCom's financial statements. The pressure to reduce the amount of line costs was enormous and caused the unjustified capitalization of ongoing operating expenses. Prior to late 00, line costs were reduced by relieving accruals that had been improperly set aside. But by the end of 00, the line costs could not be reduced since the accruals had been eliminated by prior entries. Thus, the increase in capitalization began in earnest. The Company had a line cost expensed to revenue ratio ("ER") of 41% in the 1stQ 00. This became the goal of the Company, but it was not possible due to declining prices and excess capacity. The real ER during the 1stQ 01 was 50%. On 4/26/01, WorldCom announced earnings with a line cost ER of only 42%. The Special Investigative Committee noted that "[i]t had achieved this result in substantial part by capitalizing $544.2 million in line costs."[7]

142.    There was no justification under accounting rules for capitalizing the line costs. Moreover, beyond the impropriety of the capitalization, the Company's financial statements failed to

---

[7]    Sullivan made the decision to capitalize these costs. Prior to being terminated by the Company, Sullivan wrote a "white paper" to give the justification for capitalizing the line costs. Sullivan could not justify the capitalization of these costs according to accounting rules. His main justification was business purposes, *i.e.*, that the Company should not have to recognize expenses until the capacity was used to generate revenues.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 52 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1    make required disclosures about the practice. The capitalization of line costs represented a change in

2    accounting. However, contrary to the requirements of Accounting Principal Board Opinion No. 20,

3    this was not disclosed in the 5/01 Registration Statement/Prospectus, or documents incorporated by

4    reference therein.

5    **WorldCom's Improper Use of Accruals to Reduce Line Costs**

6         143.    During 99 and 00, WorldCom used accruals from excessive charges in the past to

7    reduce line costs by $3.3 billion. The Special Investigative Committee found that

8              these accruals were an amount that had been reserved in recognition of WorldCom's
               obligation to pay anticipated bills. In effect, it took amounts that had been set aside
9              on its financial statements to cover future payments and – without regard to whether
               they needed to remain set-aside – released them to offset the line costs that were
10             actually incurred during those quarters. The result was to make line costs appear
               smaller (and pre-tax income larger) than they actually were in those periods.
11

12   While accruals do require estimation, WorldCom manipulated the process of using accruals in three

13   ways. Some accruals were released without analysis of whether the Company actually had excess

14   accruals in its account. Some accruals were released in periods other than when they were identified

15   as being excess, and in addition WorldCom released accruals that had been established for other

16   purposes. The amounts by which line costs were reduced by accrual releases, as found by the

17   Special Investigative Committee, were as follows:

18                        **Reductions to Line Costs from Accrual Releases**
                                    *(millions of dollars)*

19   | Line Costs | 2Q99 | 3Q99 | 4Q99 | 1Q00 | 2Q00 | 3Q00 | 4Q00 | TOTAL |
     |-----------|------|------|------|------|------|------|------|-------|
20   | Total     | 40   | 131  | 329  | 493  | 679  | 828  | 797  | 3,297 |

21        144.    The manipulation was not in the normal course of business, but generally these

22   adjustments to line costs from accrual releases were made in the weeks after the quarter had ended.

23   The entries were not accompanied by analysis or documentation. According to the Special

24   Investigative Committee, "WorldCom employees involved in the releases generally understood at

25   the time that they were improper. Some even raised concerns at the time of the releases." One

26   employee who questioned the adjustments was Steven Brabbs, Director of International Finance and

     Control for Europe, Middle East and Africa. He brought the appropriateness of a $33.6 million

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933                                    - 53 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1   adjustment for 00 to the attention of Andersen in the United Kingdom, yet no changes to the
2   accounting were made.

3       145.    In 3/00, Brabbs notified WorldCom executives and auditors from Andersen that the
4   Company was fraudulently accounting for line cost expenses. According to Brabbs, after
5   WorldCom's International Division had closed its books for the 1stQ 00, a journal entry reducing
6   line cost expenses by $33.6 million was made. Brabbs investigated the entry and reported later that
7   the entry had been made on the basis of a directive from Sullivan. There was no support or
8   explanation for the entry. In 4/00, Brabbs noted to Andersen's audit partner in the United Kingdom
9   that the increase in the margin trend was "obvious" and suggested that the auditors should request
10  follow through in the United States to ensure appropriate accounting treatment was in place at the
11  global consolidated level. A relevant paragraph about this transfer was included in the report that
12  Andersen U.K. sent to both Andersen and WorldCom executives. Brabbs soon received an e-mail
13  from Myers, who was angry that Brabbs had discussed the issue with Andersen.

14      146.    It was during the 2ndQ 00 that senior WorldCom finance executives in the United
15  States told Brabbs they wanted to "push down" the fraudulent entry so that it would appear in the
16  International division's accounting records rather than on the corporate books in the United States.
17  Despite his protests that he had no supporting documentation, and justification, to make the
18  adjustment, Brabbs was ordered by Sullivan to make the entry. Brabbs established a fictitious entity
19  with no legal existence, and placed the costs on the books of that sham company. Brabbs later
20  wrote:

21          "However, pressure was exerted and we were instructed to make the entry (the
        pressure we understood was from Scott [Sullivan]'s office specifically)."
22

23      147.    The Special Investigative Committee noted that:

24          In an e-mail dated October 31, 2000, Brabbs wrote to Myers and copied Yates: "An
        entry was posted into [WorldCom's accounting system] (at Scott's request I believe)
        in Q1 international results which credited line costs by $33.6m. As you know, we
25          are unable to substantiate this entry, and from an audit perspective need to clarify
        how we will treat this in the statutory financial statements at year end. At present,
26          the entry sits in [a management reporting part of the accounting system] but does not
        roll up to a true legal entity." Brabbs identified two options: either support the entry

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 54 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

or reverse it from the international books. He emphasized "I am keen to ensure we are doing this with full visibility of all concerned."

148.    Some employees refused to make the adjustments, including the CFO of UUNET, David Schmeeman, and Dolores DiCicco, the Vice-President of Wireless Finance. In both instances, Sullivan was able to get the entries made using general accounting entries at corporate level, circumventing those employees.

149.    Moreover, on 7/19/00, Tony Minert, a telecommunications reporting manager, e-mailed Myers and Yates about the increasing amounts of unused line capacity. Minert suggested to Myers and Yates that the costs of that "prepaid capacity" could possibly be capitalized as an asset, noting that "the impact could be huge." On 7/25/00, Yates and Myers rejected the idea. Yates e-mailed Minert that "'David [Myers] and I have reviewed and discussed your logic of capitalizing excess capacity and can find no support within the current accounting guidelines that would allow for this accounting treatment.'" Yet they later did it anyway.

## WorldCom's Improper Use of Accrual Accounts

150.    In addition to manipulating line costs through improper accruals, WorldCom also falsified other accounts. WorldCom maintained three large accrual accounts to accumulate accruals from other balance sheet accounts for the purpose of managing earnings to report desired results. The two employees responsible for maintaining these accounts were Troy Normand and Betty Vinson, who set up and managed the accounts. According to the Report of Investigation by the Special Investigative Committee:

> Between the third quarter of 2000 and the first quarter of 2000, these three general accrual accounts were used to reduce reported line costs by at least $120 million, SG&A expenses by at least $562 million, and miscellaneous expenses by at least $19 million, and may have caused WorldCom's EBITDA to be overstated by hundreds of millions of dollars.

151.    GAAP requires that accruals be made only when it is probable that a loss has been incurred and the amount can be reasonably estimated. See SFAS No. 5, ¶8. Moreover, as former SEC chairman Arthur Levitt stated in a speech given on 9/28/98:

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 55 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

Problems arise, however, when we see large charges associated with companies restructuring. These charges help companies "clean up" their balance sheet – giving them a so-called "big bath."

Why are companies tempted to overstate these charges? When earnings take a major hit, the theory goes Wall Street will look beyond a one-time loss and focus only on future earnings.

And if these charges are conservatively estimated with a little extra cushioning, that so-called conservative estimate is miraculously reborn as income when estimates or future earnings fall short.

When a company decides to restructure, management and employees, investors and creditors, customers and suppliers all want to understand the expected effects. We need, of course, to ensure that financial reporting provides this information. But this should not lead to flushing all the associated costs – and maybe a little extra – through the financial statements.

152.    WorldCom made a practice of manipulating accrual accounts. After making excess accruals, WorldCom would use the excess accrual at a later time to meet earnings targets. When an excess accrual was noted in another account, Normand would instruct employees to transfer the excess accrual to his "secret" reserve. These accrual accounts were then used to inflate earnings. For instance, in the 1stQ 01, when it was noted that a $7.1 million receivable from Southern Cross was uncollectible, Normand had the account written off and then had his "secret" reserve reduced by $7.1 million to offset any hit on the income statement from this receivable write-off. In 11/00, when WorldCom received $84.5 million from a settlement with AT&T from a patent litigation, rather than putting this non-recurring income on the income statement, the amount was added to the general accrual to use for future quarters when earnings would be short.

153.    According to the Special Investigative Committee's report, between 10/00 and 3/02, $705 million was moved into Normand's accrual account from other corporate accruals and more than $342 million was transferred out of the account to improve the income statement and another $395 million was reclassified to other accruals on the balance sheet such that expenses were not recorded.

154.    Similarly, Vinson, director of Management Reporting, maintained a general account that was used to over-accrue expenses to be used in the later quarters. According to the Special

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 56 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1  Investigative Committee's report, between 11/00 and 3/02, more than $789 million was transferred
2  into this account from other corporate accruals, more than $118 million was used to inflate the
3  income statement and more than $686 was used to inflate other balance sheet accounts.

4      155.    An additional accrual account was used to reduce SG&A expense by $115 million in
5  the 1stQ 00. Of the more than 100 entries which went to increase this general accrual account, most
6  of the entries went from other corporate accruals or from purchase accounting reserves. There was
7  virtually no documentation for these entries.

8      156.    The Company also reclassified billions of dollars of SG&A expenses to cost of goods
9  sold such that the expense to revenue ratios were misstated. SG&A was reduced by the following
10  amounts according to the report by the Special Investigative Committee:

**Reductions to SG&A from Reclassifications**
*(millions of dollars)*

| 1Q99 | 2Q99 | 3Q99 | 4Q99 | 1Q00 | 2Q00 | 3Q00 | 4Q00 | 1Q01 | 2Q01 | 3Q01 | 4Q01 | 1Q02 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 93 | 140 | 156 | 100 | 139 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 128 |

14  The increase to cost of goods sold which had been reclassified from SG&A were subsequently
15  reversed by the improper capitalization of line costs, described herein.

16      157.    The Company also falsified its expenses through reversals of wireless bad debt
17  accruals between the 4thQ 00 and the 1stQ 02. Prior to the MCI/WorldCom merger, MCI and
18  WorldCom had each purchased wireless resellers. These two respective resellers were combined
19  after the merger but WorldCom did not integrate their billing systems. Such customers were not
20  billed accurately or in a timely manner and a significant number of WorldCom's wireless customers
21  had not been billed for up to eight months. These became bad debts, but WorldCom refused to
22  record accruals for the bad debt in order to inflate revenues. In fact, when finance employees
23  recommended increasing the accruals, the same employees were told to reverse the accruals that then
24  existed in order to increase earnings. These entries reduced SG&A expense by $40 million in the
25  4thQ 00. Employees again told Sullivan in 1/01 the reserve for bad debts needed to be increased by
26  $37 million. Sullivan refused and had the reserve reduced by $30 million.

**Manipulation of Tax Rates**

158.    WorldCom's tax rate was manipulated to artificially low rates, resulting in accrued tax being released into earnings and earnings being artificially inflated. This manipulation, while not affecting the taxes WorldCom actually paid (according to the Special Investigative Committee), increased WorldCom's earnings by $365 million in 00 and 01. This manipulation was accomplished by WorldCom understating its Effective Income Tax ("EIT") rate. WorldCom told the market that this rate was being reduced from 42.5% in 99, to 41% in 00, to 31% in 01 and was projected to be just 36.5% in 02.

159.    The EIT rate is supposed to be calculated based on estimates of income tax payable, offset by book vs. tax differences. According to the Special Investigative Committee, at WorldCom the process was different – the reported EIT rate was simply dictated by Sullivan or Myers. In both 00 and 01, WorldCom's Tax group undertook the exercise of estimating an appropriate EIT rate. In both years, Myers or Sullivan informed the Tax group that the Company used a lower EIT rate to book income tax expense than the rate calculated by the Tax group. There was no support for the lower EIT rate Myers and Sullivan wanted to use. Eventually the Tax group was completely ignored. They were told the rate that would be used. At the end of some quarters, the Tax group learned of WorldCom's EIT rate by listening to Sullivan's conference calls with analysts; in other quarters, the rate would be communicated to the Tax group directly by Myers or Yates. The Tax group acquiesced in this process, as reflected by a 1/01 e-mail from Walter Nagel, WorldCom's General Tax Counsel, to Yates, in which Nagel stated, "'We also need to consider whether we book tax at 42% or 41%. I will call my spiritual advisor: Mr. Myers.'"

**WorldCom's Excessive Acquisition Write-offs**

160.    During the time it was rapidly expanding in 97-00 by making acquisitions, WorldCom consistently recorded excessive "one-time" write-offs and created excessive reserves in connection with acquisitions, creating artificially inflated reserves which it then later used to secretly increase reported operating earnings in later quarters by drawing down on and reducing those

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

- 58 -

1  reserves or write-offs.  This artifice was deceptive because securities analysts and sophisticated

2  investors expect an acquiring company to establish and record large reserves or write-offs in

3  connection with major acquisitions and treat such items as non-recurring, and therefore the large

4  charges did not have a negative impact on WorldCom's stock price.  Thus, WorldCom was able to

5  create and record excessive, unduly large write-offs or reserves each time it did an acquisition

6  without any adverse impact on its stock price.  WorldCom would then "draw down" on these

7  excessive reserves in later quarters by reducing these excessive reserves to boost reported operating

8  results, without disclosing that it was doing this. Some of the expenses subsequently reduced through

9  this manipulation were line costs.  This gave a misleading impression of the strength of WorldCom's

10  operations and its ongoing earnings power by artificially inflating its reported results.

11          161.  These excess acquisition charges by WorldCom were most often characterized as "in

12  process research and development costs" or other merger-related costs for which write-offs were

13  overstated to create excess reserves which could later be pulled into revenue to inflate operating

14  income.  The write-offs prior to the Offerings included:

15  
| Acquisition | In Process Research & Development | Other Charges |
|---|---|---|
| MFS Comm/UUNet | $2.14 billion | $600 million |
| BRP | | $ 47 million |
| CompuServe | $429 million | |

18  As *Business Week* noted, "Ebbers took huge write-offs associated with acquisitions, enabling him to

19  pump up future earnings."

20          162.  WorldCom also inflated its earnings by improperly misclassifying assets in

21  connection with acquisitions.  WorldCom acquired MCI in 9/98 in a transaction accounted for as a

22  purchase.  As is customary in purchase accounting, all MCI assets and liabilities were revalued at the

23  time of the acquisition to their fair market values and then combined with WorldCom's assets and

24  liabilities. WorldCom reduced the book value of MCI's property, plant, and equipment (PP&E) by

25  $3.4 billion to $10.7 billion from the pre-acquisition balance of $14.1 billion.  But then goodwill was

26  commensurately increased by the $3.4 billion reduction in PP&E.  This manipulation inflated

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 59 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

WorldCom's earnings during 99-01 since goodwill is amortized over a 40-year period as opposed to an average of 4.3 years for PP&E. Thus, the shorter lived PP&E assets were transmogrified into much longer lived assets, artificially inflating WorldCom's subsequently reported earnings. This manipulation increased WorldCom's 99, 00 and 01 earnings by hundreds of millions of dollars by reducing amortization/depreciation expense. As MSNBC reported on 7/1/02:

> In its statement to the SEC, WorldCom said its audit committee was reviewing financial records for 1999 through 2001 because questions were raised about significant changes in reserves against potential financial losses.

> *     *     *

> Companies use reserve accounts to set aside revenue to be used against predictable future costs, such as unpaid bills or pending lawsuits. Companies have much latitude to reduce or increase those reserves, but they are not supposed to do it simply to make revenues look better.

> One WorldCom reserve account that appeared to shrink substantially during 1999 and 2000 was the one it used to cover liabilities it would assume from the many companies it was buying up. WorldCom added $2.81 billion to that accounting line from 1998 to 2000, its annual filings with the SEC show.

**Depreciation Reserve Releases**

163.     From 99 to 1stQ 02, WorldCom improperly released approximately $984 million in "depreciation reserves" into income. The entries to release the reserves always occurred in the weeks after quarter-end. The Special Investigative Committee found that the quarterly amounts of the unsupported reserve releases were as follows:

**Depreciation Reserve Releases**
(*millions of dollars*)

| 1Q99 | 2Q99 | 3Q99 | 4Q99 | 1Q00 | 2Q00 | 3Q00 | 4Q00 | 1Q01 | 2Q01 | 3Q01 | 4Q01 | 1Q02 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 116 | 0 | 7 | 95 | 95 | 100 | 153 | 85 | 80 | 80 | 55 | 60 | 58 | 984 |

164.     "Depreciation reserves" are unusual in accounting. Prior to its merger with WorldCom, MCI had maintained an account that it referred to as a "depreciation reserve." The account principally was used to record small charges and credits related to assets on MCI's books. The amounts involved were small. WorldCom took this concept and used the reserve as a place to park huge amounts of excess merger reserves to be used to inflate earnings in later quarters.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 60 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

165.    The Special Investigative Committee noted that as to these excess reserves: "Company records suggest that the principal additions to the depreciation reserve made under WorldCom's management related to accounting entries resulting from the acquisitions of MCI ($151 million), UUNET ($142 million), MFS and Brooks Fiber ($95 million), WilTel ($71 million) and SkyTel ($34 million); other balances appear to have been related to ocean cable credits ($60 million), capitalized labor accounting entries ($31 million), the proceeds from the disposal of certain assets ($31 million), and transfers from obsolete inventory accruals ($26 million)." There was no support for the establishment of these credit balances and no justification for accounting for them in the manner WorldCom did.

166.    General Accounting at Company headquarters directed the systematic release of large balances from this reserve account beginning in 1stQ 99, with the effect of reducing reported depreciation expense in most quarters.

167.    Due to WorldCom's manipulation of expenses through improper accruals and subsequent unjustified accounting entries to relieve those reserves, its operating expenses were false and misleading, as were the statements about those expenses.

**WorldCom's Improper Revenue Recognition**

168.    GAAP, as described by FASB Statement of Concepts No. 5, requires that revenue not be recognized unless and until it has been both earned and is realizable (collectible). WorldCom manipulated its reported revenue in several ways, including "take or pay" contracts where customers had not agreed to pay; so-called Minimum Deficiency charges which WorldCom recorded even though it rarely if ever collected these payments from customers; recording revenue from so called billing mistakes; and other manipulations.

169.    WorldCom's revenue performance was measured and monitored by the MonRev, "a comprehensive, monthly revenue report prepared and distributed by the Revenue Accounting group." According to the Special Investigative Committee:

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

The MonRev provided a revenue snapshot of the entire company for any given period. It took computer feeds from the MCI and WorldCom billing systems, and consolidated and organized them into a collection of schedules, broken down into the company's sales channels and segments. It included dozens of spreadsheets detailing revenue data from all of those channels and segments. It also compared those actual results with budgeted numbers.

170.    Sullivan kept MonRev extremely secret. In fact, most of the improper or questionable revenue entries were booked to the "Corporate Unallocated" revenue account, which showed up only on the MonRev. These entries were large, round-dollar revenue items which were made for the quarter-ending month. They were not recorded during the quarter, but instead in the weeks after the quarter had ended. WorldCom internally referred to these entries as "Close the Gap" entries which were made to close the gap between actual revenue and revenue targets.

171.    **Take or Pay Contracts.** Prior to the Offerings, WorldCom engaged in practices for which it recognized revenue, even though it could not reasonably have expected to realize cash and for which it had not earned the revenue, thus violating both required elements for revenue recognition under GAAP. WorldCom engaged in excessive billing of other telecom companies for services and also in invoicing customers for services the customers had not agreed to purchase, since the contract period had terminated. WorldCom would recognize revenue from these billing and invoicing improprieties even though it had neither earned the revenue nor was entitled to payment for the billings.

172.    WorldCom also improperly recognized revenue in connection with "take or pay" contracts, whereby customers received a discount from WorldCom when they agreed to use a certain volume of service over a certain time period. However, if the customer used less service, WorldCom imposed a penalty on the customer. Customers were constantly using less than the specified amount, yet WorldCom improperly recognized the penalties as income even though customers were refusing to pay the penalties and WorldCom could not require them to pay.

173.    One "take or pay" contract with Electronic Data Systems ("EDS"), which ended in 10/99, provided that EDS would outsource its network and communication services over 11 years for $6 billion. The Special Investigative Committee reported that "[t]his contract proved to be the

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 62 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1   source for several Close the Gap opportunities." The first "take or pay" minimum was at the end of
2   a five-year period, yet WorldCom recorded revenue for "take or pay" minimums from EDS in the
3   very next quarter – the 1stQ 00, the last financial statements included in the 5/00 Offering.
4   WorldCom recorded $10 million in the 1stQ 00 from this contract even though it had not billed EDS
5   for the amount and even though it was probable EDS would not agree to pay the amount. In fact,
6   when WorldCom subsequently did bill EDS later in 00, EDS in fact did dispute the billings. Such
7   revenue recognition was improper because WorldCom had no reasonable expectation that it would
8   be paid for the penalties.

9       174.   **Minimum Deficiency Charges.** WorldCom also inflated revenues through similarly
10  uncollectible billings known as "Minimum Deficiency" charges. Minimum Deficiency charges arise
11  from agreements that permit a telecommunications company (WorldCom) to bill customers for
12  usage amounts that fall below contractual minimums. For example, when a customer entered into a
13  contract with WorldCom to use a minimum number of minutes in order to obtain favorable pricing,
14  the contract often provided that WorldCom was able to bill such customers retroactively for any
15  under-utilization. Minimum Deficiency charges were usually excused by WorldCom and even for
16  charges that were not excused, WorldCom rarely collected.

17      175.   Because these were not collectible, the Special Investigative Committee found that, in
18  99, the Company recorded the billings as accounts receivable, and simultaneously offset those
19  receivables with a dollar-for-dollar reserve on the balance sheet for the majority of Minimum
20  Deficiency charges. Revenues were subsequently recognized if WorldCom collected for any of the
21  billed Minimum Deficiency charges. By the 1stQ 00, the Minimum Deficiency reserve was
22  approximately $180 million.

23      176.   However, when revenues were substantially below forecasts in 2ndQ 00, WorldCom
24  began to release Minimum Deficiency reserves in order to make up some of the shortfall, even
25  though the Company had not and would not collect these amounts.

26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 · Fax: 206/749-9978

1    177.   WorldCom used approximately $100 million of Minimum Deficiency reserves in the

2  2ndQ 00 to meet revenue targets. The total reserve release was booked through three separate

3  journal entries in amounts of $4.5 million, $85.5 million, and $9.748 million. These amounts were

4  not reversed at year end 00, but continued to be included in 00 results (included in the 5/01

5  Registration Statement/Prospectus).

6    178.   Additional amounts were booked in later quarters in violation of GAAP, which

7  requires that revenue be collectible prior to recognition. See Concepts No. 5, ¶83.

8    179.   **Overbooking of Sales.** WorldCom improperly "overbooked" sales and booked

9  revenue it should not have booked because of billing "mistakes." WorldCom classified as pending

10  payments revenues it had no reason to believe it would collect because the bills had mistakes or

11  customers had dropped the service. As *Bloomberg* reported on 5/29/02:

12            After buying control of Embratel [a Brazilian long distance company] in July
           1998 ... WorldCom installed a billing system for its 12 million customers separate
13         from that used by local phone service providers.

14            It was a disaster from the start. Bills arrived irregularly – some people waited
           five or six months for details on what they owed – or in a format that confused
15         customers accustomed to receiving one monthly phone bill.

16            "Getting the bills separately is just too complicated," [a major customer] said.
         "We're not used to that."
17
             By the end of 2000, Embratel had racked up 3 billion reals in accounts
18         receivable, almost double what it was the previous year ....

19            Total accounts receivable jumped to 1.58 billion reals in 1999 from
           1.02 billion reals at the end of 1998. With receivables now at 3.44 billion reals,
20         Embratel has reached an agreement to send its bills to customers with three local
           operators.
21
These amounts were not recoverable. WorldCom has announced it has an agreement to sell
22
Embratel and the Company will receive only a fraction of this amount WorldCom paid for it in 98.
23
     180.   WorldCom also improperly recognized revenue through other various improper sales
24
manipulations, including: (a) switching customers' long distance service to WorldCom without
25
approval; (b) misrepresenting rates to customers; (c) recognizing revenue from cancelled accounts;
26
(d) back-dating contracts to recognize revenue at the end of a fiscal quarter; and (e) failing to

COMPLAINT FOR VIOLATION OF THE                    Lerach Coughlin Stoia Geller Rudman & Robbins LLP
SECURITIES ACT OF 1933                               700 Fifth Avenue, Suite 5600, Seattle, WA  98104
                                        - 64 -        Telephone: 206/749-5544 • Fax: 206/749-9978

properly account for contracts that had been negotiated or discounted.  Each of these practices
artificially inflated WorldCom's reported revenues, profits and EPS by material amounts as included
in the Registration Statements.

181.    **Impact of Improper Revenue Recognition.**  The Special Investigative Committee
noted improper revenue entries that were recorded as follows:

**Improper Revenue Entries**
*(millions of dollars)*

| 1Q99 | 2Q99 | 3Q99 | 4Q99 | 1Q00 | 2Q00 | 3Q00 | 4Q00 | 1Q01 | 2Q01 | 3Q01 | 4Q01 | 1Q02 | Total |
|------|------|------|------|------|------|------|------|------|------|------|------|------|-------|
| 86 | 5 | 65 | 50 | 19 | 121 | 161 | 27 | 17 | 132 | 117 | 92 | 67 | 958 |

The Committee also identified an additional $1.107 billion of "questionable" revenue items for
which there was insufficient support.  These entries were recorded as follows:

**Questionable Revenue Entries**
*(millions of dollars)*

| 1Q99 | 2Q99 | 3Q99 | 4Q99 | 1Q00 | 2Q00 | 3Q00 | 4Q00 | 1Q01 | 2Q01 | 3Q01 | 4Q01 | 1Q02 | Total |
|------|------|------|------|------|------|------|------|------|------|------|------|------|-------|
| 26 | 89 | 65 | 67 | 88 | 115 | 99 | 95 | 88 | 68 | 158 | 107 | 42 | 1,107 |

182.    The Special Investigative Committee found that:

From 1999 through 2001, senior WorldCom management was intensely
focused on achieving double-digit revenue growth, and revenue accounting entries
(often very large) were made during the quarterly close in order to hit these growth
targets.  At its most transparent, we discovered notes from 1999 and 2000 that
calculated the difference between "act[ual]" or "MonRev" results and "target" or
"need[ed]" numbers, and identified the entries that were necessary to make up that
difference.  Somewhat more refined, but equally effective, was the process
throughout much of 2001 in which WorldCom's Business Operations and Revenue
Accounting groups tracked the gulf between projected and target revenue – an
exercise labeled "Close the Gap" – and kept a running tally of accounting
"opportunities" that could be exploited to bridge that difference.  What emerges is a
process – by 2001, quite coordinated and institutionalized – in which revenue
"opportunities" were identified, measured and booked in the amount needed to hit
the Company's externally disclosed growth projections.

183.    For example, in the 4thQ 99, as of 1/18/00, the target was $8.760 billion, and
MonRev reported actual revenues of $8.641 billion.  The $119 million "shortfall" between Sullivan's
target revenue and actual revenue was bridged through several accounting entries, the largest of
which was a proposed $39 million balance sheet entry.  Then, on 2/10/00, WorldCom reported

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 65 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1  4thQ 99 "core revenue" of $8.760 billion, concealing what internally were called the "extraordinary

2  revenue items."

3  **WorldCom's Improper Accounting for Goodwill**

4      184.   WorldCom's financial statements were also false due to its failure to record

5  impairment in the value of goodwill on its balance sheet. WorldCom has recorded charges of

6  $45 billion retroactive to 00 and 01 to write down overvalued goodwill on its balance sheet.

7      185.   GAAP, as set forth in FASB Statement of Financial Accounting Standards ("SFAS")

8  No. 121, requires that companies review long-lived assets, including goodwill, to determine if the

9  assets are impaired. SFAS No. 121, ¶¶5-6:

10      5.   The following are examples of events or changes in circumstances that
indicate that the recoverability of the carrying amount of an asset should be assessed:

11

12      a.   A significant decrease in the market value of an asset.

13      b.   A significant change in the extent or manner in which an asset is used
or a significant physical change in an asset.

14      c.   A significant adverse change in legal factors or in the business climate

15  that could affect the value of an asset or an adverse action or assessment by a
regulator.

16      d.   An accumulation of costs significantly in excess of the amount
originally expected to acquire or construct an asset.

17

18      e.   A current period operating or cash flow loss combined with a history
of operating or cash flow losses or a projection or forecast that demonstrates
continuing losses associated with an asset used for the purpose of producing revenue.

19

20      6.   If the examples of events or changes in circumstances set forth in paragraph 5
are present or if other events or changes in circumstances indicate that the carrying
amount of an asset that an entity expects to hold and use may not be recoverable, the

21  entity shall estimate the future cash flows expected to result from the use of the asset
and its eventual disposition. Future cash flows are the future cash inflows expected

22  to be generated by an asset less the future cash outflows expected to be necessary to
obtain those inflows. If the sum of the expected future cash flows (undiscounted and

23  without interest charges) is less than the carrying amount of the asset, the entity shall
recognize an impairment loss in accordance with this Statement. Otherwise, an

24  impairment loss shall not be recognized; however, a review of depreciation policies
may be appropriate.

25  (Footnote omitted.)

26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
          - 66 -
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1    186.    Contrary to GAAP, WorldCom failed to adequately reflect the decline in value of the

2  goodwill so as to inflate reported earnings for 00 and 01. By early 00, it was becoming increasingly

3  clear that the goodwill on WorldCom's balance sheet was inflated. By late 00, the deterioration in

4  the telecom market had materially reduced the value of many of the assets WorldCom had acquired,

5  which indicated that the goodwill was not worth anywhere near what WorldCom reported in its

6  financial statements. As of 3/31/00 and 12/31/00, WorldCom reported intangible assets (net of

7  amortization) of $47.1 billion and $46.6 billion, respectively, including goodwill of $44.87 billion at

8  12/31/00. The 00 Form 10-K, which was incorporated by reference into the 5/01 Registration

9  Statement, also represented that:

10         Realization of acquisition related intangibles, including goodwill, is periodically
           assessed by the management of the Company based on the current and expected
11         future profitability and cash flows of acquired companies and their contribution to
           the overall operations of WorldCom.

12
   The 99 Form 10-K, incorporated by reference in the 5/00 Registration Statement, contained a similar
13
   representation.
14
         187.    In fact, these companies' values were impaired by billions of dollars at the time
15
   WorldCom reported its 1stQ 00, 00 and 1stQ 01 results, but WorldCom failed to record this
16
   impairment since its disclosure would have potentially placed WorldCom in violation of its debt
17
   covenants due to the decline in shareholder equity, and resulted in a downgrade in its credit rating to
18
   below investment grade and likely prevented the 5/00 and 5/01 offerings from occurring.
19
         188.    During 96-99, WorldCom made several large acquisitions, resulting in billions of
20
   dollars of goodwill going on to its balance sheet as an asset. In 96, WorldCom acquired
21
   MFS Communications in a $14 billion deal that provided WorldCom with its Internet data business.
22
   WorldCom also acquired long-distance company MCI for $40 billion, and other companies (Brooks
23
   Fiber, CompuServe) for billions more. However, by 3/00, WorldCom's telecom business assets –
24
   acquired by WorldCom in 96-00 – were actually worth billions of dollars less than what was being
25
   reported by WorldCom on its balance sheet. As a result, at the time of the 5/00 and 5/01 offerings,
26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933                                    - 67 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1  the true value of WorldCom's assets was billions of dollars less than reported by WorldCom in its

2  financial reports – assets WorldCom has admitted it would write down by $45 billion.

3       189.  The Company's Plan of Reorganization stated:

4       The value of goodwill reflected on the Company's last reported balance sheet,
        $45 billion, is impaired and has been written off completely; and the value of PP&E
5       and other intangible assets reflected on the Company's last reported balance sheet,
        $39.2 billion and $5.6 billion, respectively, is impaired and has been adjusted to a
6       value of approximately $10 billion as of December 31, 2002.

7       190.  WorldCom has admitted as part of its restatement that most of its goodwill write-

8  downs should have occurred in 00. The impact on WorldCom's financial statements from this

9  failure to record the impairment had enormous significance:

10                              Goodwill & Intangibles

11  |                   | As Reported | As Restated | Overstatement |
    |-------------------|-------------|-------------|---------------|
    | As of 12/31/00    | $42.995 B   | $5.820 B    | 638%          |
12  | As of 12/31/01    | $46.583 B   | $2.284 B    | 1939%         |

13      191.  WorldCom failed to write down the value of its assets (goodwill) associated with its

14  acquisitions prior to the 5/00 and 5/01 offerings because had it done so these write-downs would

15  have placed WorldCom in violation of, or on the verge of being in violation of, its loan net worth

16  covenants in its $12 billion commercial paper back-up credit facilities. A write-down of

17  WorldCom's overvalued assets prior to 5/00 and 5/01 would have also vastly reduced WorldCom's

18  shareholder equity and placed it in violation of other debt covenants. These would have been

19  material adverse facts that would have had to have been disclosed in connection with the 5/01

20  offering and would likely have resulted in WorldCom's credit rating being downgraded below

21  "investment grade" and would have made the 5/01 offering impossible.

22  **WorldCom's Manipulations of Uncollectible Receivables**

23      192.  GAAP, as set forth in SFAS No. 5, requires that a loss be recorded for receivables

24  when it is probable they will not be collected. SFAS No. 5, ¶¶8, 22-23.

25      193.  By 5/98, WorldCom was owed $165 million from a customer named Resurgens from

26  a 96 transaction. WorldCom's receivable from Resurgens was secured only by shares of Resurgens

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 68 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1  stock. In 5/98, Resurgens filed for bankruptcy, making WorldCom's equity interest worthless and
2  making it highly unlikely WorldCom would ever collect the receivable. WorldCom did not write
3  this receivable off. Instead it was able to avoid writing off this receivable through a manipulative
4  transaction it arranged. WorldCom caused another company (World Access) to merge with
5  Resurgens and assume the obligation to WorldCom. World Access agreed to this because
6  WorldCom agreed to buy $25 million per month of international long distance services from World
7  Access. Thus, WorldCom was in essence buying back its own receivable. It did not need the long
8  distance services but agreed to them solely to avoid recording the write-down. WorldCom's
9  Registration Statement/Prospectus and subsequent statements failed to disclose that WorldCom
10 avoided writing off a receivable only by essentially buying it back through another entity.

11 **WorldCom's Improper Capitalization of Software Development Costs for Internal Use**

12    194.    WorldCom also improperly capitalized (recorded costs as an asset rather than as an
13 expense) certain internal software development costs which did not qualify for capitalization
14 pursuant to GAAP.

15    195.    GAAP, as set forth in FASB Interpretations No. 6, ¶8, states:

16    Costs incurred by an enterprise in developing computer software internally for use in
      its research and development activities are research and development costs and,
17    therefore, shall be charged to expense when incurred. This includes costs incurred
      during all phases of software development because all of those costs are incurred in a
18    research and development activity.

19 (Footnote omitted.)

20    196.    Contrary to GAAP and the doctrine of "fair presentation," in 00 WorldCom
21 capitalized $925 million in costs associated with developing internal use software, which amounts
22 were excessive and improper. Had WorldCom properly recorded these costs as expenses, its
23 reported earnings would have been at least 14% lower.

24 **WorldCom's Restatement Is an Admission of Falsity**

25    197.    The fact that WorldCom has restated its financial statements is an admission that the
26 financial statements originally issued were false and that the overstatement of income was material.

1  Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of
2  restatement announced by WorldCom was to correct for material errors in its previously issued
3  financial statements.  *See* APB No. 20, ¶¶7-13.  The restatement of past financial statements is a
4  disfavored method of recognizing an accounting change as it dilutes confidence by investors in the
5  financial statements, it makes it difficult to compare financial statements and it is often difficult, if
6  not impossible, to generate the numbers when restatement occurs.  *See* APB No. 20, ¶14.  Thus,
7  GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when
8  there is a change in the reporting entity, there is a change in accounting principles used or to correct
9  an error in previously issued financial statements.  WorldCom's restatement was not due to a change
10  in reporting entity or a change in accounting principle, but rather to errors in previously issued
11  financial statements.  Thus the restatement is an admission by WorldCom that its previously issued
12  financial results and its public statements regarding those results were materially false.

13  **WorldCom's Financial Statements Violated Fundamental GAAP**

14      198.    Due to these accounting improprieties, the Company presented its financial results
15  and statements in a manner which violated GAAP, including the following fundamental accounting
16  principles:

17          (a)    The principle that interim financial reporting should be based upon the same
18  accounting principles and practices used to prepare annual financial statements was violated (APB
19  No. 28, ¶10);

20          (b)    The principle that financial reporting should provide information that is useful
21  to present and potential investors and creditors and other users in making rational investment, credit
22  and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

23          (c)    The principle that financial reporting should provide information about the
24  economic resources of an enterprise, the claims to those resources, and effects of transactions, events
25  and circumstances that change resources and claims to those resources was violated (FASB
26  Statement of Concepts No. 1, ¶40);

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 70 -
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 · Fax: 206/749-9978

1         (d)     The principle that financial reporting should provide information about how

2 management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

3 for the use of enterprise resources entrusted to it was violated. To the extent that management offers

4 securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

5 accountability to prospective investors and to the public in general (FASB Statement of Concepts

6 No. 1, ¶50);

7         (e)     The principle that financial reporting should provide information about an

8 enterprise's financial performance during a period was violated. Investors and creditors often use

9 information about the past to help in assessing the prospects of an enterprise. Thus, although

10 investment and credit decisions reflect investors' expectations about future enterprise performance,

11 those expectations are commonly based at least partly on evaluations of past enterprise performance

12 (FASB Statement of Concepts No. 1, ¶42);

13         (f)     The principle that financial reporting should be reliable in that it represents

14 what it purports to represent was violated. That information should be reliable as well as relevant is

15 a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

16         (g)     The principle of completeness, which means that nothing is left out of the

17 information that may be necessary to insure that it validly represents underlying events and

18 conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

19         (h)     The principle that conservatism be used as a prudent reaction to uncertainty to

20 try to ensure that uncertainties and risks inherent in business situations are adequately considered

21 was violated. The best way to avoid injury to investors is to try to ensure that what is reported

22 represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

### OTHER REASONS STATEMENTS IN THE REGISTRATION STATEMENTS WERE FALSE

    199.    The Registration Statements also incorporated by reference all documents filed

pursuant to §13(a) of the Exchange Act prior to the respective offerings, as described herein, and

contained statements other than financial statements which were false and misleading.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 71 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

**The 5/00 Offering**

200.   The statements in the 5/00 Registration Statement that made it appear that the acquisition of Sprint would likely be successful were false.

201.   In fact, the Sprint merger faced significant regulatory hurdles and its consummation was highly suspect.  WorldCom's stock had appreciated significantly on the news and would decline if the merger was blocked.  The decline in WorldCom's stock price would make (and did make) the Company's debt securities less attractive.

202.   The 5/00 Registration Statement also omitted the $679 million Ebbers' holding company (Joshua Timberlands) had borrowed from Travelers Insurance (a subsidiary of CitiGroup) which was secured by his WorldCom stock.

**The 5/01 Offering**

203.   The narrative statements in the 5/01 Registration Statement concerning WorldCom's business and recent results were also false and misleading.  The 1stQ 01 results were overstated in terms of revenue, net income and EPS as well as WorldCom's assets, for all of the reasons stated herein regarding WorldCom's falsification of its financial statements.  Thus, claims that the 1stQ 01 results were "an excellent start" or that WorldCom was "on track" to deliver "strong growth and solid performance throughout the year" were false as the 1stQ 01 results were the effect of financial manipulation, not the actual performance or strength of WorldCom's business.  The statements regarding the progress made regarding the MCI group were also false as that part of WorldCom's business was performing horribly, and contained billions and billions of dollars of overstated assets which, if properly valued or written off, would have shown in fact that the MCI part of WorldCom's business was suffering huge losses.

204.   In addition, the statement in the 5/01 Registration Statement that WorldCom was "positioned to use" its "global assets and ... customer base" to lead a new generation of fast growing e-commerce and data-driven segments in the communications industries was false.  In fact, WorldCom's business was imploding at the time of the 5/01 Registration Statement and the only

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1   way this could be concealed was to falsify WorldCom's financial statements and make these types of
2   false statements about WorldCom's business. Also, the statement that the "breadth and scale" of
3   WorldCom's services differentiated WorldCom from its competitors was also false as nothing that
4   WorldCom was offering to the marketplace was unique. All of its products and services were
5   nothing more than commodity-type services, the profitability of which was being increasingly
6   destroyed by intensive, if not uncontrolled, price competition. As a result, claims in statements that
7   WorldCom was "well positioned to capitalize on growth opportunities" were also false as in fact
8   WorldCom's business had no growth opportunities left. WorldCom was competing now in a
9   shrinking universe of business, declining revenues, and shrinking profit margins which would, in
10  short order, bring the business to the brink of bankruptcy.

11         205.   The statement in the 5/01 Registration Statement that WorldCom believed its "sales
12  and marketing capabilities are one of [its] strongest competitive advantages" was also false.
13  WorldCom's sales and marketing capabilities were the result of dishonest practices in violation of
14  both federal and state laws. Despite repeated warnings from regulators and, indeed, enforcement
15  actions, WorldCom was consistently engaging in disreputable, if not unlawful, practices to obtain
16  and retain customer accounts, thus artificially boosting its customer accounts, revenues and reported
17  income.

18         206.   CitiGroup's loans to Ebbers' entity, Joshua Timberlands, had increased to
19  $679 million. Despite the fact that CitiGroup was the lead underwriter of the 5/01 offering, this fact
20  was not disclosed. The 5/01 Registration Statement/Prospectus also concealed CitiGroup's
21  involvement in helping Ebbers dispose of 3 million shares of his WorldCom stock through contracts
22  which allowed Ebbers to avoid reporting these transactions as sales.

23         207.   The statement in the 5/01 Registration Statement that WorldCom had taken a
24  $685 million charge in the 3rdQ 00 for specific accounts "that were no longer deemed collectible
25  due to bankruptcies, litigation and settlements of contractual disputes that occurred in the third
26  quarter of 2000" was false. Hundreds of millions of dollars of these charges were due to the

1    correction of a myriad of unsavory and improper practices that WorldCom's MCI unit had utilized to

2    artificially inflate its revenues and earnings for several years (95-00) and which MCI and WorldCom

3    had concealed, falsifying its 98 and 99 annual results and 00 quarterly financial results. These ploys

4    – mainly used to avoid recognizing uncollectible accounts receivable generated by phony revenue

5    transactions – included: (i) turning long overdue customer accounts receivable into "new"

6    promissory notes and treating them as current; (ii) "place holder credits" by which overdue accounts

7    receivable were credited even though no payment had been received; (iii) phony factoring of

8    receivables to make them appear to have been paid or guaranteed by a factor when in fact MCI

9    secretly guaranteed the factor against loss; and (iv) not recording in a timely manner hundreds of

10   millions of dollars of over-charges on or refunds due to customers.

11          208.    Had WorldCom's 5/01 Registration Statement revealed these true facts, it would have

12   been apparent to investors that WorldCom had been falsifying its financial statements for years

13   rather than suffering write-downs due to very recent events, all of which had just occurred in one

14   quarter, i.e., the 3rdQ 00. In addition, the statement regarding the $685 million charge was false in

15   making it appear that WorldCom had "cleaned up" its accounts receivable and that it no longer had

16   any material amount of uncollectible accounts receivable. In fact, WorldCom still had hundreds of

17   millions of dollars of uncollectible accounts receivable, especially in its wireless resale business, a

18   line of business which was losing huge amounts, in large part because it was selling to

19   uncreditworthy and unsuccessful wireless communications entities which were unable to pay

20   WorldCom – a situation so serious that WorldCom could not even sell this business off but would

21   simply have to abandon it, something Ebbers' successor has announced WorldCom would do.

22   **WorldCom's False Financial Ratios**

23          209.    WorldCom's overstated revenues and earnings also materially misstated its financial

24   position in the Registration Statements. WorldCom's reported ratio of earnings to fixed charges was

25   a crucial figure for investors in WorldCom Bonds to evaluate the safety of the investment. This ratio

26   indicates the Company's ability to meet its interest payments from ongoing earnings and together

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 74 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1   with a corporation's assets and shareholder equity is perhaps the most important financial

2   information in a debt sale. A higher ratio indicates an increased ability to make interest payments,

3   and hence a higher margin of safety for investors. WorldCom reported a ratio of earnings to fixed

4   charges of 7.01 to 1 for 3/31/00 in the 5/00 Registration Statement, and 5.25 to 1 for 00 in the 5/01

5   Registration Statement, consistent with WorldCom's investment-grade credit rating. In fact, these

6   ratios were highly inflated and misleading as to the true nature of the risk involved in purchasing

7   WorldCom Bonds. Absent the accounting manipulations described herein, these ratios of earnings to

8   fixed charges would have been much lower, and would have exposed the true high risk involved in

9   purchasing these bonds. Had WorldCom properly expensed the $925 million in software

10  development costs for internal use it incurred during 00, as required by GAAP or the doctrine of

11  "fair presentation," rather than capitalizing it as an asset, and had WorldCom recorded just $5 billion

12  of the $45 billion (11% of the amount required) impairment in goodwill which it should have

13  recorded during 00, WorldCom's ratio of earnings to fixed charges in the Registration Statements

14  would have been wiped out. This does not even include WorldCom's other accounting

15  falsifications, including recording excessive merger charges, misclassifying assets, improper

16  capitalization of normal operating expenses, and improper revenue recognition.

17  **The Underwriters' "Spinning Activities"**

18  210.   The 5/00 and 5/01 Prospectuses/Registration Statements were also misleading in that

19  each failed to disclose the "spinning" practices certain of the underwriters had engaged in to win the

20  right to underwrite the Offerings and receive the enormous underwriting fees alleged herein.

21  211.   "Spinning" refers to a practice by a Wall Street firm of doling out IPO shares in new

22  companies to executives of existing corporations in exchange for lucrative investment banking

23  business from the executives' corporations. As *Washington Post* staff writer Ben White wrote on

24  9/26/02:

25              In remarks at a conference of pension-fund managers on Tuesday, Spitzer
            said IPO spinning amounted to "commercial bribery." He said fund managers should
26          pressure the companies they hold in their portfolios to force executives to give back
            profits they made selling IPO shares.

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 75 -

Spinning also emerged as an issue in Congress last month when documents released by the House Financial Services Committee showed that the former chief executive of WorldCom Inc., Bernard J. Ebbers, made nearly $11 million from initial public offerings by selling shares, mainly in hot technology stocks, awarded to him by Salomon Brothers and its successor firm, Salomon Smith Barney. During the same period Ebbers received the shares, WorldCom was paying Salomon hundreds of millions of dollars in investment-banking fees.

The documents also showed that Salomon brokers sought to award tens of thousands of IPO shares to other favored telecommunications executives. It is not clear whether many of these executives actually received the shares. Salomon was the leading banker for telecom firms in the late 1990s.

212.   A "hot issue" from an IPO which trades at a premium in the secondary market whenever such secondary market begins trading is a "hot" IPO share. The fact that an IPO is "hot" creates a very high demand for the hot IPO shares in the secondary market. This in turn raises the prices of such shares in the secondary markets, often to extraordinary amounts. Thus, the ability to purchase hot IPO shares at the initial price creates a tremendous opportunity for a quick profit. An investor purchasing hot IPO shares at the IPO price can sell the shares in the secondary market within days, or even hours, from the initial purchase for an immediate and hefty profit. Hot IPO shares became known as one of Wall Street's hottest currencies, or so called "free money."

213.   One of the key Salomon Smith Barney employees involved in determining which top executives got what hot IPO shares was Rick Olson ("Olson"), who worked in Salomon Smith Barney's Los Angeles office. One of Olson's employers during the relevant period was David Chacon.   Olson's clients included top management of many of the top telecommunications companies, including WorldCom and Qwest. Chacon has confirmed that Olson was given his own IPO share allocation, which was separate and distinct from Salomon Smith Barney's standard allocation. Olson's "Private Wealth Management" office received 35% of the total IPO shares allocated for distribution for Salomon Smith Barney's ten largest branches and Olson's office combined. Chacon has stated that "Rick Olson was the point man for Jack Grubman. He was in charge of managing the personal stock portfolios of the corporate decision makers whom [Salomon Smith Barney] did investment banking business with, strictly in the telecommunications sector ...." Chacon also stated that "Grubman would be very much involved in the management of these

1    portfolios and ensuring that his top decision makers, within a corporation, who directed investment

2    banking business to the firm, were being taken care of." Elaborating further on Grubman's role in

3    the spinning process, Chacon said, "Jack Grubman's role [was] calling the syndicate desk and

4    ensuring that his guys are being taken care of. Jack Grubman's involvement is communicating with

5    Rick Olson and ensuring that their accounts are doing well. Jack Grubman's involvement is sitting

6    down with Corporate officers on a daily basis and asking them the question: 'Are you happy with the

7    returns that you're getting at our firm?'" Chacon also revealed that, while other Wall Street firms

8    also engaged in spinning of upcoming hot IPO shares, Grubman and Salomon Smith Barney took the

9    process one step further by offering coveted IPO shares after the shares had turned "hot" in the

10   secondary market. As Chacon described:

11           So rather than, Goldman Sachs saying, "Bernie we've got 10,000 shares of XYZ at
             the IPO price," the day before the stock starts trading, Salomon would be able to take
12           it [up] a few notches and be able to call these same officers and directors, saying,
             "Look I have 20,000 shares of this company. It's trading at $85 right now, and [we]
13           wanted to give you the opportunity to invest at the IPO price.

14   According to a chart CitiGroup provided to the House Committee on Financial Services in 8/02,

15   Ebbers received approximately 10,000 shares of the IPO of Rhythms NetConnections, which soared

16   229% on its first trading day in 4/99, but Chacon has stated Ebbers may have actually received

17   350,000 shares of Rhythm shares.

18           214.    In the summer of 02, Congressional investigators learned that CitiGroup had given

19   Ebbers hot IPO shares, allowing him to pocket $11 million in risk-free profits. CitiGroup received

20   lead roles in the Offerings in exchange for this bribe to Ebbers.

21           215.    CitiGroup's allocation of IPO shares to Ebbers began at least as early as 96 when he

22   was given 200,000 shares of McLeod USA (out of a total 300,000 shares for all CitiGroup retail

23   customers) for which Ebbers received risk-free profits of $2.5 million. Ebbers received additional

24   profits of $4.5 million for 100,000 shares of Metromedia Fiber he was allocated in late 97. Ebbers

25   shared some of the profits from the allocations with Sullivan through payments made on CitiGroup

26   accounts, including for the allocation of Juniper shares in 5/99. Other IPO allocations Ebbers

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933                      - 77 -

1  received were for Qwest, NextLink, Teligent, Focal Communications, KPNQwest, Tycom, UPS,

2  Allegiance Telecom and Rhythms NetConnections.  These deals were also highly lucrative for

3  CitiGroup, which was paid nearly $250 million in fees for advising Qwest and MetroMedia on

4  numerous transactions.

5       216.   Nevertheless, the Company did not describe this quid pro quo in the Registration

6  Statements when discussing its underwriting agreements.  The various Registration Statements stated

7  only that:

8       •    5/00

9           The underwriters and their affiliates have performed certain investment
            banking and advisory and general financing and banking services for us from time to
10          time for which they have received customary fees and expenses.  The underwriters
            and their affiliates may, from time to time, be customers of, engage in transactions
11          with and perform services for us in the ordinary course of their business.  Salomon
            Smith Barney Inc. has acted as financial advisor to WorldCom in connection with the
12          Sprint merger, for which it has received certain fees and for which it expects to
            receive additional fees upon the closing of the Sprint merger.  In addition, Salomon
13          Smith Barney Inc. will receive a financial advisory fee in connection with this
            offering.

14
        •    5/01:
15
           The underwriters and their affiliates have performed certain investment
16          banking, advisory and general financing and banking services for us from time to
            time for which they have received customary fees and expenses.  The underwriters
17          and their affiliates may, from time to time, be customers of, engage in transactions
            with and perform services for us in the ordinary course of their business.  Certain of
18          the underwriters and their affiliates have in the past and may in the future act as
            lenders in connection with our credit facilities.
19
        217.   These practices were also omitted from Salomon Smith Barney's and Grubman's
20
    reports which information was necessary to prevent the reports from being materially misleading.
21
        218.   The omission of the millions of dollars Ebbers and other WorldCom executives
22
    received from the banks, including CitiGroup, through hot IPO allocations in exchange for
23
    investment banking business made the Registration Statements false and misleading.
24

25

26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 78 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

**COUNT I**

**For Violation of §11 of the Securities Act Against the
Individual Defendants, Andersen and the Underwriter Defendants
for Losses Suffered from Plaintiff's
Purchases in the 5/00 and 5/01 Offerings**

219.   Plaintiff incorporates and realleges each and every allegation contained in the foregoing paragraphs with respect to the 5/00 and 5/01 offerings as if fully set forth herein.

220.   The Individual Defendants signed false and misleading Registration Statements with respect to the 5/00 and 5/01 offerings.

221.   Andersen consented to the inclusion of its opinion on WorldCom's 99 and 00 financial statements in the Registration Statements/Prospectuses and reviewed and approved the 3/31/00 and 3/31/01 financial results in the Registration Statements.

222.   The underwriters listed in ¶223 below sold the WorldCom Bonds in the Offerings as defined in §11(a)(5) of the Securities Act.   These Underwriter Defendants were, therefore, responsible for the contents of the Registration Statements.

223.   The following Underwriter Defendants underwrote the Offerings and the following Individual Defendants signed the false and misleading Registration Statements for the Offerings as indicated below:

| Offering | Underwriters | Individual Defendants |
|---|---|---|
| 5/00 | Banc of America Securities, LLC, Salomon Smith Barney, Inc., Credit Suisse First Boston Corp., Deutsche Banc Alex. Brown Inc., Goldman Sachs & Co., Lehman Brothers, Inc., J.P. Morgan Securities, Inc., UBS Warburg, Blaylock | Ebbers, Sullivan |
| 5/01 | ABN AMRO, Banc of America Securities LLC, Salomon Smith Barney, Inc., Deutsche Banc Alex. Brown Inc., J.P. Morgan Securities Inc., Blaylock, Utendahl | Ebbers, Sullivan |

224.   Each of these defendants owed to the purchasers of the WorldCom Bonds, including plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 79 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1   Registration Statements at the time they became effective, to ensure that they were true and that
2   there was no omission to state a material fact required to be stated in order to make the statements
3   contained therein not misleading.  In the exercise of reasonable care, defendants knew or should
4   have known of the material misstatements and omissions contained in the Registration Statements.

5   225.    To protect their own financial position and avoid having WorldCom draw down on its
6   $12 billion commercial paper back-up facility with them, and to get their share of $85 million in
7   underwriting fees, the banks were willing to merchandise the WorldCom Bonds in the Offerings.
8   The Underwriter Defendants named herein arranged a multi-city Roadshow prior to the Offerings
9   during which they, and certain of WorldCom's management, including Ebbers, met with potential
10  investors and money managers and presented highly favorable information about the Company,
11  including forecasts of strong revenue and profit growth for WorldCom.  Further, indicating the
12  willful and/or intentional nature of their misconduct, these Underwriter Defendants also demanded
13  and obtained an agreement from WorldCom that it would indemnify and hold them harmless from
14  any liability for violations of the Securities Act, which agreement was in violation of law and public
15  policy.  The banks also made sure that WorldCom had purchased millions of dollars in directors' and
16  officers' liability insurance to protect the banks from liability in connection with the Offerings.

17  226.    None of the defendants named in this Claim made a reasonable investigation or
18  possessed reasonable grounds for the belief that the statements contained in the Registration
19  Statements were true and did not omit any material facts and were not misleading.

20  227.    The defendants named herein caused to be issued and participated in the issuance of
21  materially false and misleading statements in the Registration Statements and Prospectuses, which
22  misrepresented or failed to disclose, *inter alia*, the adverse facts set forth above.  Thus, these
23  defendants violated §11 of the Securities Act. The offering and sale of WorldCom Bonds pursuant
24  to the respective Registration Statements was an initial public offering of the respective bonds
25  issued, which bonds had never before existed, been issued or been publicly traded.  Therefore, the
26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
- 80 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1  "safe harbor" under the Securities Act does not apply to statements made in the Registration
2  Statements.

3      228.    Plaintiff purchased WorldCom Bonds traceable to the false and misleading
4  Registration Statements without knowledge of the untruths or omissions alleged herein. Plaintiff
5  could not have reasonably discovered the nature of these untruths and omissions, and relied either
6  directly or indirectly on the false and misleading Registration Statements in making its purchases of
7  WorldCom Bonds.

8      229.    As a result of its purchases of the WorldCom Bonds, plaintiff has suffered damages.

9  <center>**COUNT II**</center>

10 <center>**For Violation of §15 of the Securities Act Against the Individual Defendants and
Defendants Bank of America Corp., Deutsche Bank AG, Goldman Sachs Group, Inc., J.P.
11 Morgan Chase & Co., Lehman Brothers Holdings Inc., CitiGroup, Inc. and Credit Suisse
Group for Losses Suffered from Plaintiff's Purchases in the 5/00 and 5/01 Offerings**</center>

12
13     230.    Plaintiff repeats and realleges the allegations contained in each of the foregoing
paragraphs.

14
15     231.    This claim is asserted pursuant to §15 of the Securities Act on behalf of plaintiff who
purchased WorldCom Bonds pursuant to the 5/00 and 5/01 Registration Statements.

16
17     232.    The Individual Defendants acted as controlling persons of WorldCom within the
meaning of §15 of the Securities Act as alleged herein. By reasons of their
18 executive/managerial/director positions with WorldCom, these defendants had the power and
19 authority to cause WorldCom to engage in the wrongful conduct complained of in plaintiff's §11
20 claim.

21     233.    By reason of the aforementioned wrongful conduct, the Individual Defendants are
22 liable pursuant to §15 of the Securities Act. As a direct and proximate result of their wrongful
23 conduct, plaintiff suffered damages in connection with its purchase or acquisition of WorldCom
24 Bonds.

25     234.    This claim is also brought pursuant to §15 of the Securities Act against Bank of
26 America Corp., Deutsche Bank AG, Goldman Sachs Group, Inc., J.P. Morgan Chase & Co., Lehman

1    Brothers Holdings Inc., CitiGroup, Inc. and Credit Suisse Group. Bank of America Corp., Deutsche
2    Bank AG, Goldman Sachs Group, Inc., J.P. Morgan Chase & Co., Lehman Brothers Holdings Inc.,
3    CitiGroup, Inc. and Credit Suisse Group controlled each of their respective subsidiaries and
4    affiliates.

5    235.    These defendants' subsidiaries and affiliates are liable under §11 of the Securities Act
6    and defendants Bank of America Corp., Deutsche Bank AG, Goldman Sachs Group, Inc., J.P.
7    Morgan Chase & Co., Lehman Brothers Holdings Inc., CitiGroup, Inc. and Credit Suisse Group are
8    jointly and severally liable with and to the same extent as their respective subsidiaries and affiliates.

9    236.    By virtue of their ownership and/or executive positions, superior position, contractual
10   rights, participation in and/or interaction in the operations and/or underwriting of the 5/00 and 5/01
11   offerings for WorldCom Bonds, as alleged above, these defendants had the power to influence and
12   control and did influence and control, directly or indirectly, the decision-making of their
13   subsidiaries, including the content and dissemination of the various statements which plaintiff
14   contends are false and misleading and violate §11 of the Securities Act.  CitiGroup also became
15   intimately involved in Salomon Smith Barney's and Grubman's improper relationships with Ebbers
16   and arranged for an undisclosed loan to Ebbers from Travelers, a CitiGroup subsidiary.

17   237.    By virtue of their positions as controlling persons of their subsidiaries, these
18   defendants are liable pursuant to §15 of the Securities Act. As a direct and proximate result of these
19   defendants' wrongful conduct, plaintiff suffered damages in connection with its purchase or
20   acquisition of WorldCom Bonds.

21                                    **PRAYER FOR RELIEF**

22        WHEREFORE, plaintiff prays for judgment as follows:

23        A.    Awarding plaintiff rescission or damages;

24        B.    Awarding plaintiff pre-judgment and post-judgment interest, as well as reasonable
25   attorneys' fees, expert witness fees and other costs;

26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
                                    - 82 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1       C.     Awarding plaintiff punitive damages in an amount sufficient to deter others from the

2   commission of like offenses;

3       D.     Awarding plaintiff such equitable relief, including preliminary and/or permanent

4   injunctive relief, to freeze or prevent the disposition of the assets of the defendants as necessary to

5   preserve and protect plaintiff's right to recover; and

6       E.     Awarding such other legal or equitable relief as this Court may deem just and proper.

7   <div align="center">**JURY DEMAND**</div>

8       Plaintiff demands a trial by jury.

9   DATED: September 30, 2004             LERACH COUGHLIN STOIA GELLER
                                 RUDMAN & ROBBINS LLP

10                               TAMARA J. DRISCOLL

11

12

13                               TAMARA J. DRISCOLL

14                               700 Fifth Avenue, Suite 5600
                             Seattle, WA 98104

15                               Telephone: 206/749-5544
                             206/749-9978 (fax)

16

17                               LERACH COUGHLIN STOIA GELLER
                               RUDMAN & ROBBINS LLP

18                               WILLIAM S. LERACH
                             DARREN J. ROBBINS

19                               MICHAEL J. DOWD
                             SPENCER A. BURKHOLZ

20                               DAVID C. WALTON
                             401 B Street, Suite 1700

21                               San Diego, CA 92101
                             Telephone: 619/231-1058

22                               619/231-7423 (fax)

23

24

25

26

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933
         - 83 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA 98104
Telephone: 206/749-5544 • Fax: 206/749-9978

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

LERACH COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
RANDI D. BANDMAN
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

C:\\Word\Cpt WC - WA Fed.doc

COMPLAINT FOR VIOLATION OF THE
SECURITIES ACT OF 1933

- 84 -

Lerach Coughlin Stoia Geller Rudman & Robbins LLP
700 Fifth Avenue, Suite 5600, Seattle, WA  98104
Telephone: 206/749-5544 • Fax: 206/749-9978

**EXHIBIT A**

Western Conference of Teamsters Pension Trust

Exhibit A

| Name | Acquisition Date | Face Amount | Per Note Price | Total Cost | Sold/Hold Date | Face Amount Sold/Held | Per Note Price | Proceeds |
|---|---|---|---|---|---|---|---|---|
| **8.00% Notes due 05/15/2006** | | | | | | | | |
| **Original Issue 5/2000** | | | | | | | | |
| **Prudential 9815TDAC0** | | | | | | | | |
| Western Conference of Teamsters Pension Trust | 05/19/2000 | 2,950,000 | $98.94 | $2,918,583 | 03/01/2002 | 5,700,000 | $99.32 | $5,661,126 |
| Western Conference of Teamsters Pension Trust | 05/19/2000 | 5,700,000 | $98.94 | $5,639,265 | 03/01/2002 | 1,000,000 | $99.32 | $993,180 |
| Western Conference of Teamsters Pension Trust | 05/19/2000 | 500,000 | $98.94 | $494,675 | 03/06/2002 | 2,950,000 | $99.87 | $2,946,165 |
| Western Conference of Teamsters Pension Trust | 05/19/2000 | 1,000,000 | $98.94 | $989,350 | 03/06/2002 | 500,000 | $99.87 | $499,350 |
| **Western Conference of Teamsters Pension Trust** | | **10,150,000** | | **$10,041,903** | | **10,150,000** | | **$10,099,821** |
| **8.25% Notes due 05/15/2010** | | | | | | | | |
| **Original Issue 5/2000** | | | | | | | | |
| **Prudential 9815TDAD8** | | | | | | | | |
| Western Conference of Teamsters Pension Trust | 05/19/2000 | 4,200,000 | $98.49 | $4,136,538 | 06/25/2002 | 4,200,000 | $42.00 | $1,764,000 |
| **Western Conference of Teamsters Pension Trust** | | **4,200,000** | | **$4,136,538** | | **4,200,000** | | **$1,764,000** |
| **8.25% Note due 5/15/2031** | | | | | | | | |
| **Original Issue 5/2001** | | | | | | | | |
| **Prudential 9815TDAK2** | | | | | | | | |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 1,040,000 | $98.10 | $1,020,219 | 05/02/2002 | 700,000 | $42.25 | $295,750 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 1,420,000 | $98.10 | $1,392,992 | 05/02/2002 | 750,000 | $41.70 | $312,750 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 1,730,000 | $98.10 | $1,697,095 | 05/02/2002 | 250,000 | $43.00 | $107,500 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 2,585,000 | $98.10 | $2,535,633 | 05/02/2002 | 750,000 | $42.25 | $316,875 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 4,660,000 | $98.10 | $4,669,465 | 06/05/2002 | 4,760,000 | $44.00 | $2,094,400 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 10,465,000 | $98.10 | $10,265,956 | 06/05/2002 | 400,000 | $44.00 | $176,000 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 55,000 | $98.10 | $33,193 | 06/05/2002 | 1,000,000 | $44.00 | $440,000 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 130,000 | $98.10 | $127,527 | 06/05/2002 | 1,300,000 | $44.00 | $572,000 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 160,000 | $98.10 | $156,957 | 06/19/2002 | 2,585,000 | $41.70 | $1,077,945 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 240,000 | $98.10 | $235,435 | 06/19/2002 | 240,000 | $41.70 | $100,080 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 400,000 | $98.10 | $392,392 | 06/19/2002 | 600,000 | $41.70 | $250,200 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 975,000 | $98.10 | $956,456 | 06/20/2002 | 1,040,000 | $40.00 | $416,000 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 240,000 | $99.06 | $237,739 | 06/20/2002 | 95,000 | $40.00 | $38,000 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 330,000 | $99.06 | $326,891 | 06/20/2002 | 240,000 | $40.00 | $96,000 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 400,000 | $99.06 | $395,232 | 06/20/2002 | 300,000 | $40.00 | $120,000 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 600,000 | $99.06 | $584,348 | 06/25/2002 | 1,420,000 | $38.08 | $540,779 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 1,000,000 | $99.06 | $960,580 | 06/25/2002 | 1,730,000 | $38.75 | $670,375 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 2,430,000 | $99.06 | $2,407,109 | 05/25/2002 | 130,000 | $38.08 | $49,508 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 300,000 | $98.10 | $294,294 | 05/25/2002 | 160,000 | $38.75 | $62,000 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 345,000 | $98.10 | $338,438 | 05/25/2002 | 330,000 | $38.08 | $125,674 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 500,000 | $98.10 | $490,400 | 05/25/2002 | 400,000 | $38.75 | $155,000 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 1,300,000 | $98.10 | $1,275,274 | 05/25/2002 | 345,000 | $38.08 | $131,386 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 700,000 | $98.10 | $686,686 | 05/25/2002 | 500,000 | $38.75 | $193,750 |
| Western Conference of Teamsters Pension Trust | 05/09/2001 | 3,105,000 | $98.10 | $3,046,943 | 05/25/2002 | 10,465,000 | $15.25 | $1,595,913 |
| Western Conference of Teamsters Pension Trust | 01/10/2002 | 750,000 | $98.10 | $735,735 | 05/28/2002 | 975,000 | $15.25 | $148,688 |

Page 1

8/11/2004

Western Conference of Teamsters Pension Trust

| Name | Acquisition Date | Face Amount | Per Note Price | Total Cost | Sold/Hold Date | Face Amount Sold/Held | Per Note Price | Proceeds |
|---|---|---|---|---|---|---|---|---|
| Western Conference of Teamsters Pension Trust | 01/10/2002 | 250,000 | $105.67 | $264,170 | 06/26/2002 | 2,430,000 | $15.25 | $370,675 |
| Western Conference of Teamsters Pension Trust | 01/10/2002 | 250,000 | $105.67 | $792,510 | 06/26/2002 | 3,105,000 | $15.25 | $473,513 |
| Western Conference of Teamsters Pension Trust | | 37,000,000 | | $38,419,950 | | 37,000,000 | | $10,930,659 |

**8.25% Note due 5/15/2031**
**Original Issue 5/2001**
**Camden 98157DAK2**

| Name | Acquisition Date | Face Amount | Per Note Price | Total Cost | Sold/Hold Date | Face Amount Sold/Held | Per Note Price | Proceeds |
|---|---|---|---|---|---|---|---|---|
| Western Conference of Teamsters Pension Trust | 02/04/2002 | 2,500,000 | $91.32 | $2,282,925 | 04/30/2002 | 700,000 | $40.50 | $283,500 |
| Western Conference of Teamsters Pension Trust | 02/04/2002 | 2,300,000 | $94.47 | $2,172,787 | 04/25/2002 | 600,000 | $56.00 | $336,000 |
| Western Conference of Teamsters Pension Trust | | | | | 04/23/2002 | 1,000,000 | $59.00 | $590,000 |
| Western Conference of Teamsters Pension Trust | | | | | 04/22/2002 | 500,000 | $64.00 | $320,000 |
| Western Conference of Teamsters Pension Trust | | | | | 04/10/2002 | 2,000,000 | $74.13 | $1,482,500 |
| Western Conference of Teamsters Pension Trust | | 4,800,000 | | $4,455,712 | | 4,800,000 | | $3,002,000 |

Page 2

5/11/2004